# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POPE & TALBOT, INC., et al.,[1] | ) | Case No. 07-11738 (___) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## MOTION OF THE DEBTORS FOR AN ORDER, INTER ALIA, AUTHORIZING DEBTORS TO: (I) PAY PREPETITION EMPLOYEE WAGES, SALARIES AND OTHER COMPENSATION, REIMBURSE CONTRACT PERSONNEL SERVICE PROVIDERS FOR WAGES ATTRIBUTABLE TO INDIVIDUALS PROVIDING SERVICES TO THE DEBTORS AND PAY PREPETITION SALES COMMISSIONS TO SALES REPRESENTATIVES; (II) REIMBURSE PREPETITION EMPLOYEE BUSINESS EXPENSES; (III) MAKE PAYMENTS FOR WHICH PREPETITION PAYROLL DEDUCTIONS WERE MADE; (IV) CONTRIBUTE TO PREPETITION EMPLOYEE AND RETIREE BENEFIT PROGRAMS AND CONTINUE SUCH PROGRAMS IN THE ORDINARY COURSE; (V) PAY WORKERS' COMPENSATION OBLIGATIONS; AND (VI) PAY ALL COSTS AND EXPENSES INCIDENT TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS

Pope & Talbot, Inc. ("Pope & Talbot"), on behalf of itself and its affiliated

debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"),

hereby submits this motion (this "Motion") for an order, *inter alia*, authorizing, but not directing,

the Debtors, in accordance with their stated policies, to: (i) pay all prepetition wages, salaries

and other accrued compensation to employees, retirees and non-employee directors, reimburse

contract personnel service providers for wages attributable to individuals providing services to

the Debtors and pay all prepetition sales commissions to sales agents; (ii) reimburse all

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Pope & Talbot, Inc. (7139); Penn Timber, Inc. (7380); Pope & Talbot Lumber Sales, Inc. (7029); Pope & Talbot Pulp Sales U.S., Inc. (2041); Pope & Talbot Relocation Services, Inc. (9015); Pope & Talbot Spearfish Ltd. Partnership (2569); P&T Power Company (2710); Mackenzie Pulp Land Ltd. (CCID No. 625473); Pope & Talbot Ltd. (3102); P&T Factoring Limited Partnership (1538); P&T Finance One Limited Partnership (8395); P&T Finance Three LLC (2468); P&T Finance Two Limited Partnership (7960); P&T Funding Ltd. (3717); and P&T LFP Investment Limited Partnership (None). The address for all Debtors is 1500 SW First Avenue, Suite 200, Portland, Oregon 97201.

prepetition employee business expenses; (iii) make all payments for which prepetition payroll deductions, withholdings or matching employer contributions were made; (iv) make all contributions to prepetition employee and retiree benefit programs and continue these programs in the ordinary course of business; (v) honor workers' compensation program obligations; and (vi) pay all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers. In support of this Motion, the Debtors submit the Declaration of Harold N. Stanton in Support of First Day Motions, sworn to on November 19, 2007 (the "Stanton Declaration"), and respectfully represent and set forth as follows:

## Background

1.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' cases. As of the date hereof, no creditors' committee has been appointed.

2.      On October 29, 2007 (the "Canadian Filing Date"), certain of the Debtors — Pope & Talbot, Pope & Talbot Ltd., Mackenzie Pulp Land Ltd., Penn Timber, Inc., Pope & Talbot Lumber Sales, Inc., Pope & Talbot Pulp Sales U.S., Inc., Pope & Talbot Relocation Services, Inc., P&T Power Company, P&T Finance Three LLC and P&T Funding Ltd. (collectively, the "Canadian Debtors") — applied for protection from their creditors in Canada pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (Canada) (the

"CCAA"; and the cases commenced by the Canadian Debtors thereunder, the "CCAA Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"). On the same date, the Canadian Court issued an "initial order" (the "CCAA Initial Order") pursuant to which it, *inter alia*, granted the application of the Canadian Debtors for protection under the CCAA, imposed a stay of all proceedings (the "CCAA Stay") against the Canadian Debtors and their property, created certain administrative liens, appointed PricewaterhouseCoopers Inc. as monitor (the "Canadian Monitor") in the CCAA Proceedings, and set forth certain other limitations and procedures for all parties in interest in the CCAA Proceedings. A copy of the CCAA Initial Order is attached to the Stanton Declaration as Exhibit A.

   3. Pope & Talbot, which was founded in 1849, is the direct or indirect corporate parent of all of the other Debtors and their non-debtor affiliates (collectively, the "Company"). The Company is headquartered in Portland, Oregon, and currently conducts business in two operating segments:  (i) pulp, the principal raw material used in the manufacture of paper products, which the Company produces in three of its mills (two in British Columbia and one in Oregon) and (ii) wood products (i.e., lumber), which the Company produces in four of its mills (three in British Columbia and one in South Dakota).

   4. Additional factual background relating to the Debtors' business and the commencement of these chapter 11 cases and the CCAA proceedings is set forth in detail in the Stanton Declaration filed contemporaneously with this Motion and incorporated herein by reference.

## Facts Specific to the Relief Requested Herein

5. The Debtors currently have approximately 2,300 active employees (the "Employees"), of whom approximately 1,820 are hourly[2] Employees and the balance are salaried Employees. Approximately 56% of the Debtors' Employees are associated with the wood products business, 41% are associated with the pulp business and the balance consists of corporate management and administrative personnel. Approximately 570 Employees are employed by Pope & Talbot, and approximately 1,730 Employees are employed by Pope & Talbot Ltd. In addition, the Debtors utilize the services of approximately 20 non-Employee sales agents (collectively, the "Sales Agents") and approximately 50 independent contractors (collectively, the "Contract Service Personnel").

6. As discussed in greater detail below, in the CCAA Initial Order, the Canadian Court authorized the Debtors to pay and honor "all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses and expenses." CCAA Initial Order ¶ 7 (a). Since the Canadian Filing Date, the Debtors have continued to pay all amounts due with respect to such authorization in the ordinary course of their business.

## A. Prepetition Employee Obligations

### A. Wages, Salaries and Other Compensation

7. The Debtors' average aggregate monthly compensation to Employees for wages and salaries is approximately $13.3 million.[3] Approximately $3.3 million per month

---

[2] Approximately 87% of the Debtors' hourly Employees are union employees (the "Union Employees"), who have benefit policies (including, but not limited to, overtime, vacation, pension, defined contributory benefit and pension plans and other applicable benefits) that are covered by collective bargaining agreements (the "CBAs"). The only hourly employees who are not Union Employees are those employed at the Spearfish facility.

[3] All dollar amounts used in this Motion are in United States dollars unless otherwise indicated.

relates to Pope & Talbot Employees and approximately $10 million per month relates to Pope & Talbot Ltd. Employees. The Debtors' payroll is funded through a combination of direct deposit and payments made via check. The Debtors' hourly Employees are paid on a bi-weekly schedule, and are paid up to 20 days in arrears (*i.e.*, up to 20 days after completion of their period of work). Salaried Employees are paid on a semi-monthly schedule.

8.     Due to the filing of these chapter 11 cases, some of the Employees have not received wages for time worked prior to the Petition Date. Moreover, some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.[4]

9.     The Debtors estimate that the aggregate amount of accrued prepetition wages, salaries, overtime pay, and other cash compensation that remained unpaid to the Employees as of the Canadian Filing Date was approximately $3.8 million (the "Unpaid Employee Compensation"), all of which was outstanding with respect to Pope & Talbot Ltd. Employees. The Debtors estimate that the amount of Unpaid Employee Compensation as of the Petition Date is $1,691,800, of which $800 is outstanding with respect to Pope & Talbot Employees, and $1,691,000 is outstanding with respect to Pope & Talbot Ltd. Employees. To the best of the Debtors' knowledge, no Employee is owed more than $10,950 for Unpaid Employee Compensation, nor was any Employee owed more than such amount prior to the Canadian Filing Date.[5]

---

[4]     Additionally, some discrepancies may exist between the amounts actually paid and amounts Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

[5]     The calculation of Unpaid Employee Compensation incorporates payments outstanding on account of wages,

**B.** **Reimbursement of Prepetition Employee Business Expenses**

        10.     In the ordinary course of business, the Debtors reimburse Employees for certain expenses that they incur on behalf of the Debtors or within the scope of their employment (the "Reimbursable Expenses"). Reimbursable Expenses include reasonable expenses for travel and other reasonable expenses while conducting company business. The Reimbursable Expenses generally are reimbursed within one week of the submission of a proper expense report. The Debtors spend approximately $30,000 per month on Reimbursable Expenses, and estimate that, as of both the Canadian Filing Date and the Petition Date, less than $6,750 of Reimbursable Expenses were unpaid.[6]

**C.** **Prepetition Deductions and Withholdings; Payroll Taxes**

        11.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks (collectively, the "Deductions"), including, without limitation: (i) union dues; (ii) garnishments for child support and similar deductions; (iii) voluntary charitable contributions; (iv) pre-tax contributions to health, dependent care and transit flexible spending accounts; (v) Employee contributions to the 410(k) Plan (as defined below); and (vi) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein and other miscellaneous deductions. The Debtors

---

    salaries and vacation pay (to the extent it is payable in cash and the relevant Employee has sought payment in cash). The calculation does not attempt to allocate other benefits, including post-retirement benefits or health and dental benefits.

[6]    Although the monthly average Reimbursement Expense amount provides guidance as to the amount that may be outstanding as of the Petition Date, there is no practical way for the Debtors to determine the actual amount of prepetition Reimbursable Expenses. A Reimbursable Expense is paid by the Debtors only after an Employee submits appropriate paperwork for reimbursement. Although, as noted, the Debtors generally process requests within one week of submission, the Debtors do not require Employees to submit requests within a specific time period after the expenses are incurred.

deduct an aggregate of approximately $1.22 million per month with respect to Deductions, of which approximately $460,000 per month is deducted with respect to Pope & Talbot Employees, and approximately $760,000 per month is deducted with respect to Pope & Talbot Ltd. Employees.

12.     The Debtors also are required by law to (i) withhold from an Employee's wages amounts related to, among other things, federal, state, local income taxes, social security and Medicare taxes for Pope & Talbot Employees, and federal, provincial and Canadian Pension Plan ("CPP") taxes for Pope & Talbot Ltd. Employees (collectively, the "Withheld Amounts"), for remittance to the appropriate taxing authorities and (ii) make matching payments for social security, Medicare and CPP taxes, and pay, based upon a percentage of gross payroll, additional amounts for state unemployment insurance in the United States, federal unemployment insurance in the United States and Canada and workers' compensation benefits in Canada (the "Employer Payroll Taxes," and, together with the Withheld Amounts, the "Payroll Taxes").[7] On a monthly basis, the Debtors withhold an aggregate of approximately $3.26 million per month with respect to Deductions, of which approximately $740,000 is withheld from the paychecks of Pope & Talbot Employees, and $2.52 million is withheld from the paychecks of Pope & Talbot Ltd. Employees.

---

[7]  Inasmuch as the Canadian workers' compensation system is government administered, Pope & Talbot Ltd. funds the workers' compensation coverage for the Debtors' Canadian Employees through workers' compensation taxes paid to the government (the "Workers' Compensation Taxes"). The approximate monthly cost to the Debtors of the Workers' Compensation Taxes is $292,660. As of the Petition Date, approximately $188,000 in Workers' Compensation Taxes has accrued and not yet been paid by the Debtors.

**D.** **Contract Service Personnel, Contract Personnel Suppliers and Sales Agents**

### 1. Contract Service Personnel

13.     The Debtors hire Contract Service Personnel through agencies and other third parties ("Contract Personnel Suppliers") to work in various positions including, but not limited to, professional positions, sales and marketing roles, administrative positions, clerical positions and manufacturing positions. Many of the Contract Service Personnel are critical to the Debtors' operations and, in some cases, interact directly with suppliers, customers and other third parties with which the Company conducts business. To the best of the Debtors' knowledge, none of the Contract Service Personnel is owed more than $10,950 with respect to services performed prior to the Petition Date.[8]

### 2. Contract Personnel Suppliers

14.     The Debtors generally reimburse Contract Personnel Suppliers on a weekly basis. The Debtors believe that Contract Personnel Suppliers may refuse to provide Contract Service Personnel postpetition if they are not paid for prepetition services rendered. The Debtors estimate that, as of the Petition Date, no more than approximately $10,500 remains outstanding to Contract Personnel Suppliers with respect to services performed by the Contract Service Personnel and related fees to Contract Personnel Suppliers (collectively, the "Unpaid Contract Personnel Compensation").

---

[8]     The amounts paid to the Contract Personnel Suppliers generally are based on contractually specified hourly billing rates for identified categories of Contract Service Personnel. The Contract Personnel Suppliers are responsible for making all payments of wages to the Contract Service Personnel and also are responsible for providing the employee benefits received by the Contract Service Personnel, if any.

### 3. Sales Agents

15.     The Debtors sell their pulp products in Europe and Asia through approximately 20 independent sales agents (collectively, the "Sales Agents"), which represent the Debtors in the promotion and sale of their products and negotiation of supply contracts. In addition, the Sales Agents generally are responsible for communications with customers relating to the sale and marketing of the Debtors' products, maintaining relationships with customers and, in some cases, collecting from customers and remitting to the Debtors payments for their products. Among other things, the Sales Agents generally provide the Debtors with information as to changes in requirements, nature, quality or quantity of products, any complaints or other problems with the products, delivery or other matters, creditworthiness of customers and changes in the market, including matters that relate to competition of the Debtors.

16.     The Sales Agents are not Employees of the Debtors. The Sales Agents earn commissions (the "Sales Commissions") calculated based on the amount of the Debtors' product sold by the Sales Agents to customers in their territories. Sales Agents are paid Sales Commissions for sales that they have made upon receipt by the Debtors of payment from customers for those sales or, if the Sales Agents collect payments from customers on behalf of the Debtors, they deduct the Sales Commissions to which they are entitled from the amounts remitted to the Debtors. In the event that the Sales Agents are not paid their prepetition Sales Commissions, they may cease providing services to the Debtors or may hold payments from customers against prepetition Sales Commissions amounts outstanding. The Debtors estimate

that approximately $400,000 is owed to the Sales Agents in Sales Commissions accrued but not paid prior to both the Canadian Filing Date and the Petition Date.[9]

**E.** **Prepetition Employee Benefits**

17. The Debtors provide their Employees and, in certain cases, retired Employees (the "Retirees"), directly or indirectly, and in the ordinary course of business, with a variety of benefits (collectively, the "Employee Benefits"), including, but not limited to: (i) medical, health, dental insurance and other related coverage; (ii) certain leave benefits; (iii) Defined Contribution Plans (as defined below); and (iv) other miscellaneous benefits that are described in greater detail below. The Debtors estimate that, as of the Canadian Filing Date, the total amount owed or accrued in connection with the Employee Benefits was approximately $17 million, of which approximately $3 million was outstanding with respect to Pope & Talbot Employees, and approximately $14 million was outstanding with respect to Pope & Talbot Ltd. Employees.[10] The Debtors estimate that the total amount outstanding as of the Petition Date in connection with the Employee Benefits is $20 million, of which approximately $4 million is outstanding with respect to Pope & Talbot Employees, and approximately $16 million is outstanding with respect to Pope & Talbot Ltd. Employees. Based upon such estimates, the average amount of Employee Benefits due per Employee as of both the Canadian Filing Date and the Petition Date was approximately $8,695.

---

[9] Contemporaneously herewith, the Debtors are filing a motion to reject the sales agency contracts of Papcel S.R.L. and Itochu Corporation. The amount set forth herein does not include any prepetition Sales Commissions that may be outstanding to Papcel S.R.L. or Itochu Corporation.

[10] This estimate excludes any accrued but unused vacation time, sick days or personal days.

### 1. Medical, Healthcare, Dental and Other Plans

18.    The Debtors offer several insurance policies to certain of their Employees and Retirees for medical, health and dental insurance coverage, through third-party insurers or other plans and also have certain healthcare-related funding obligations relating to severed Employees (collectively, the "Medical and Dental Benefits").[11] The Debtors estimate that, as described in greater detail below, as of the Canadian Filing Date, the aggregate amount due and outstanding with respect to the Medical and Dental Benefits was approximately $947,000, of which approximately $521,000 was outstanding with respect to Pope & Talbot Employees, and approximately $426,000 was outstanding with respect to Pope & Talbot Ltd. Employees. The Debtors estimate that the total amount outstanding as of the Petition Date in connection with the Medical and Dental Benefits is $1.42 million, of which approximately $640,000 is outstanding with respect to Pope & Talbot Employees, and approximately $780,000 is outstanding with respect to Pope & Talbot Ltd. Employees.

19.    In the United States, Pope & Talbot provides its Employees and certain eligible Retirees with the opportunity to enroll in either fully insured or self-insured medical and dental plans.[12] The Debtors pay monthly premiums of approximately $74,100 under the fully insured medical and dental plans. Under its self-insured medical plan, Pope and Talbot pays Employees' medical and dental claims of approximately $445,125 per month. The claims paid by Pope & Talbot are limited to an aggregate of $185,000 per Employee pursuant to a stop-loss

---

[11]    Pope & Talbot and Pope & Talbot Ltd. collectively sponsor many different Medical and Dental Benefits, which are administered through numerous third parties. Employees', Retirees' and their dependants' eligibility for these benefits varies depending on the terms of the applicable medical or dental benefit.

[12]    The Debtors reserve their rights to discontinue post-retirement medical benefits.

policy maintained by Pope & Talbot, for which the premiums are approximately $14,500 per month. On average, Pope & Talbot pays premiums and claims in an aggregate amount of approximately $6.54 million per year for medical and dental benefits for its Employees.

20.     In Canada, Pope & Talbot Ltd. provides its Employees and certain eligible Retirees with enrollment in either fully insured or self-insured medical and dental plans. In Canada, Pope & Talbot Ltd. maintains a fully insured provincial medical and hospitalization plan as required by the government, under which the Company pays a monthly premium based on the number of Employees and their dependents — the current estimated monthly cost of which is $179,000. To supplement the provincial medical and hospitalization plan, the Debtors provide a self-insured extended health plan for salaried Employees,[13] under which Pope & Talbot Ltd. pays estimated monthly claims of approximately $131,100. The Debtors maintain a stop-loss insurance policy that limits the Debtors' liability for each Employee's claim under the extended health plan to an aggregate of $25,000 per calendar year. Pope & Talbot Ltd. also provides its Employees with a dental plan that is self-insured. Hourly Employees are eligible for reimbursement by Pope & Talbot Ltd. for all dental claims covered by the plan; for salaried Employees, Pope & Talbot Ltd.'s obligation to pay covered claims is limited to an aggregate of $2,000 per Employee per year. The Debtors' estimated monthly cost for the dental plan is approximately $117,000. In Canada, the Debtors also provide benefit-eligible salaried Retirees of Pope & Talbot Ltd. and their eligible dependants with the opportunity to enroll in various life

---

[13]     As part of the extended health program, the Debtors provide Canadian salaried Employees at the Mackenzie pulp mill and Fort St. James sawmill with medical travel benefits so that Employees can obtain access to medical care when necessary, due to the fact that only limited medical care is available at or near these mills.

insurance, extended health insurance and provincial medical and hospitalization plans, for a total estimated annual cost of $600,000.[14]

## 2. Life, Supplemental Life and Accidental Death and Dismemberment Insurance

21.     In both the United States and Canada, the Debtors provide basic life insurance and accidental death and dismemberment coverage ("Life and AD&D Insurance Coverage") to all salaried Employees and certain hourly Employees and Retirees. The total estimated annual cost for premiums in respect of Life and AD&D Coverage is $180,000 for Employees and Retirees of Pope & Talbot and $875,000 for Employees of Pope & Talbot Ltd. The Debtors estimate that, as of the Canadian Filing Date, the amount outstanding with respect to the Life and AD&D Insurance Coverage was approximately $88,000, of which approximately $15,000 was outstanding with respect to Pope & Talbot Employees and approximately $73,000 was outstanding with respect to Pope & Talbot Ltd. Employees. The Debtors estimate that the total amount outstanding as of the Petition Date in connection with the Life and AD&D Insurance Coverage is $132,000, of which approximately $22,500 is outstanding with respect to Pope & Talbot Employees, and approximately $109,500 is outstanding with respect to Pope & Talbot Ltd. Employees.

22.     In both the United States and Canada, salaried Employees may supplement the Life and AD&D Insurance Coverage with optional personal life insurance, accidental death and dismemberment insurance, and coverage of spouses and children ("Supplemental Life Insurance"). Participating Employees pay all premiums in connection with

---

[14]     The Debtors reserve their rights to discontinue post-retirement medical benefits.

the Supplemental Life Insurance. Accordingly, the Debtors believe that they do not owe any prepetition amounts in connection with Supplemental Life Insurance.

### 3. Travel Accident Insurance Benefits

23. In Canada, the Debtors provide certain hourly and salaried Employees with business travel accident insurance (the "Business Travel Accident Insurance Policy"). Because the Debtors make annual prepayments at the beginning of each year under the Business Travel Accident Insurance Policy, the Debtors estimate that, as of the Petition Date, no amounts are outstanding under this policy.

### 4. Disability Coverage

24. The Debtors provide both short-term and long-term disability benefits (the "Short-Term Disability Benefits" and "Long-Term Disability Benefits," respectively) to all salaried Employees. In the United States and Canada, the Short-Term Disability Benefits for salaried Employees of Pope & Talbot (which vary depending on the length of the Employee's service) are funded entirely by the Debtors. The Short-Term Disability Benefits for hourly Employees of Pope & Talbot are provided through various insurance policies. The Debtors estimate that, as of the Canadian Filing Date, approximately $129,000 was outstanding in connection with the Short-Term Disability Benefits, of which approximately $25,000 was outstanding with respect to Pope & Talbot Employees, and $104,000 was outstanding with respect to Pope & Talbot Ltd. Employees. The Debtors estimate that the total amount outstanding as of the Petition Date in connection with the Short-Term Disability Benefits is $193,500, of which approximately $37,500 is outstanding with respect to Pope & Talbot

Employees, and approximately $156,000 is outstanding with respect to Pope & Talbot Ltd. Employees.

25.     Long-Term Disability Benefits for salaried and certain hourly Employees of Pope & Talbot and Pope & Talbot Ltd. are provided through various insurance policies, under which the total estimated annual premiums are approximately $1.8 million. The Debtors estimate that, as of the Canadian Filing Date, approximately $152,000 was outstanding in connection with the Long-Term Disability Benefits premiums, of which approximately $10,000 was outstanding with respect to Pope & Talbot Employees, and $142,000 was outstanding with respect to Pope & Talbot Ltd. Employees. The Debtors estimate that the total amount outstanding as of the Petition Date in connection with premiums for Long-Term Disability Benefits is $228,000, of which approximately $15,000 is outstanding with respect to Pope & Talbot Employees, and approximately $213,000 is outstanding with respect to Pope & Talbot Ltd. Employees.

**5.     Vacation, Overtime and Leave Policies**

26.     In both the United States and Canada, the Debtors provide most Employees with various paid time-off benefits, depending upon the Employee's classification and length of employment. The Debtors provide some form of paid leave or enhanced compensation in connection with vacation time, overtime, holidays, personal leave, jury duty and bereavement leave (collectively, the "Vacation, Overtime and Leave Policies").

27.     Pursuant to the Debtors' vacation policies at some of their facilities, certain Employees are permitted to carry over accrued but unused vacation time to the following calendar year, and some Employees are permitted to receive pay in lieu of earned vacation time

(including carried-over time) pursuant to specified procedures and eligibility requirements. Most Employees also are entitled to a cash payout for accrued and unused vacation days upon termination of employment with the Debtors. Certain Employees also are permitted to "bank" their vacation time and overtime pursuant to established procedures permitting for the carry over of such accrued benefits. The Debtors estimate that, as of the Canadian Filing Date, the aggregate amount due and outstanding with respect to the Vacation, Overtime and Leave Policies was approximately $16.3 million, of which approximately $2.5 million was outstanding with respect to Pope & Talbot Employees and approximately $13.8 million was outstanding with respect to Pope & Talbot Ltd. Employees. The Debtors estimate that the total amount outstanding as of the Petition Date in connection with the Vacation, Overtime and Leave Policies is $16.9 million, of which approximately $2.6 million is outstanding with respect to Pope & Talbot Employees, and approximately $14.3 million is outstanding with respect to Pope & Talbot Ltd. Employees.

### 6.      Defined Contribution and Defined Benefit

28.      Prior to the Petition Date and in the ordinary course of business, the Debtors maintained certain pension and savings plans for the benefit of their Employees. In the United States, the Debtors' 401(k) plan (the "401(k) Plan") is a tax qualified retirement savings plan under which all Pope & Talbot Employees are entitled to make pre-tax contributions from their cash compensation, subject to Internal Revenue Code limitations. The Debtors make matching contributions for all participants each year equal to the lesser of 50% of the Employee's contribution to the 401(k) Plan or 6% of the Employee's total cash compensation. Approximately 550 Employees participate in the 401(k) Plan. The Debtors estimate that, as of

the Canadian Filing Date, the amount of accrued but unpaid matching contributions outstanding for the benefit of Pope & Talbot Employees under the 401(k) Plan was approximately $67,520. The Debtors estimate that, as of the Petition Date, the amount of accrued but unpaid matching contributions outstanding for the benefit of Pope & Talbot Employees under the 401(k) Plan is approximately $101,000.

29.     In Canada, the Debtors maintain a defined benefit retirement savings plan (the "Defined Benefit Plan") for salaried Employees hired prior to January 1, 2004. Pursuant to the Defined Benefit Plan, Pope & Talbot Ltd. makes annual contributions in an approximate amount of $5 million on behalf of the 194 Employees who are eligible under the plan. For salaried Employees hired on or after January 1, 2004, Pope & Talbot Ltd. maintains a defined contribution retirement savings plan (the "Defined Contribution Plan"), pursuant to which Pope & Talbot Ltd. makes monthly contributions equal to 7% of each participant's earnings. Approximately 155 Pope & Talbot Ltd. Employees are eligible for and participate in the Defined Contribution Plan. The Debtors estimate that the amount of accrued but unpaid contributions outstanding for the benefit of Pope & Talbot Ltd. Employees as of the Canadian Filing Date under the Defined Benefit Plan and the Defined Contribution Plan was approximately $72,000. The Debtors estimate that the amount of accrued but unpaid contributions outstanding for the benefit of Pope & Talbot Ltd. Employees as of the Petition Date under the Defined Benefit Plan and the Defined Contribution Plan is approximately $1.06 million.

### 7.     Bridge Payments and Retiree Allowance

30.     In Canada, pursuant to certain of the CBAs in place at its mills, Pope & Talbot Ltd. makes monthly "bridge payments" to Employees who choose to retire early pursuant

to the terms and conditions of the CBAs. As of the Petition Date, approximately 80 early Retirees are eligible for bridge payments in an aggregate monthly amount of approximately $60,000. The Debtors estimate that the amount of bridge payments outstanding for the benefit of Pope & Talbot Ltd. Employees as of both the Canadian Filing Date and the Petition Date is approximately $60,000.

### 8. Severance Policies and Agreements

#### (a) Salaried Employee Severance Policy

31.     In both the United States and Canada, the Debtors have a general severance policy that provides severance benefits to salaried Employees who meet the requirements of the plan (the "Salaried Employee Severance Policy"). In the United States, the Debtors provide severed salaried Employees with one week's pay for each year of service, for a severance payment equal to a minimum of four weeks' and a maximum of six months' salary. In Canada, the Debtors maintain the same policy, but follow standard governmental guidelines and practices in British Columbia that provides in certain circumstances for Employees to receive additional severance benefits. In both the United States and Canada, the Debtors believe that no amounts are outstanding under the Salaried Employee Severance Policy as of the Petition Date.

#### (b) Pulp and Spearfish Severance Agreements

32.     As an alternative to the Salaried Employee Severance Policy, six Pope & Talbot Employees and three Pope & Talbot Ltd. Employees — none of whom are members of Pope & Talbot's senior management — that perform services for the Debtors' pulp business, elected to participate in a separate severance plan, as set forth in severance agreements between each participating Employee and Pope & Talbot (each, a "Pulp Severance Agreement"), which

was put into place when the Company was marketing its pulp business. Similarly, one Pope & Talbot Employee and nine Pope & Talbot Ltd. Employees — none of whom are members of Pope & Talbot's senior management — who work at the Spearfish sawmill, elected to participate in a separate severance plan, as set forth in severance agreements between each participating Employee and Pope & Talbot (each, a "Spearfish Severance Agreement"), which was put into place when the Company was marketing its Spearfish operation. Pursuant to the Pulp Severance Agreements and the Spearfish Severance Agreements, covered Employees are eligible to receive a severance payment equal to a maximum of 24 months' salary and other benefits upon the sale of the Company's pulp business or the Spearfish mill, respectively.

**9.      Employee Assistance Program**

33.      The Debtors provide all Employees with access to an employee assistance program (the "Employee Assistance Program"). The Employee Assistance Program provides Employees and their dependants with assessments and short-term counseling with respect to various issues, including: family concerns; career changes; life crises related to death, divorce, illness and other major events; personal and work pressures; alcohol and drug problems; relationship conflicts; financial and legal concerns; and parenting and child care issues. Employees typically attend three counseling or assistance sessions and then may be referred to outside professionals, some of which are covered under the Debtors' medical plans. The Debtors spend approximately $10,000 per month on the Employee Assistance Programs, and estimate that, as of the Petition Date, no amounts are outstanding under the Employee Assistance Programs.

### 10. Employee Relocation Programs

34. The Debtors provide assistance and reimbursement for relocation expenses for Salaried Employees transferred from one location to another and for salaried new hires that must relocate (the "Employee Relocation Policy"). The Employee Relocation Policy covers the Employee and immediate dependents currently living with the Employee and who will live with the Employee at the new location. The Debtors estimate that, as of both the Canadian Filing Date and the Petition Date, the amount outstanding under the Employee Relocation Policy is approximately $103,700, of which approximately $10,700 is outstanding with respect to Pope & Talbot Employees, and approximately $93,000 is outstanding with respect to Pope & Talbot Ltd. Employees.

### 11. Tuition and Scholarship Programs

35. The Debtors have implemented various educational and service programs. The corporate scholarship program (the "Corporate Scholarship Program") provides recipients with scholarships of $1,500 per year for a maximum of four undergraduate years or the completion of a baccalaureate degree, whichever comes first. The Debtors estimate that, as of both the Canadian Filing Date and the Petition Date, an aggregate amount of $60,000 is outstanding under the Corporate Scholarship Program, of which approximately $17,000 is outstanding with respect to Pope & Talbot Employees, and approximately $43,000 is outstanding with respect to Pope & Talbot Ltd. Employees.

### 12. Bonus Plans

36. The Debtors maintain a variety of performance bonus and incentive pay programs, none of which (other than the Retention Plan (as defined below)) was designed solely

as a retention plan. The Debtors anticipate honoring such plans in the ordinary course of business and, except with respect to the Retention Plan and the Pulp Price Trigger Bonus Plan (both of which have payments earned or fully vested under them as of the Petition Date),[15] do not seek any approval or authorization to make payments with respect to such plans hereunder.

(a)     Pulp Price Trigger Bonus

37.     Under the CBAs in effect at the Mackenzie and Nanaimo mills, the Debtors have implemented a bonus plan (the "Pulp Price Trigger Bonus") that provides for a $500 bonus payment to each active Employee at those mills per calendar quarter for each quarter that the NBSK price for the Eastern United States averages over $700. The NBSK price was over $700 for each of the first three quarters of 2007, which triggered bonus obligations under the Pulp Price Trigger Bonus plan for each quarter. The estimated aggregate quarterly payment to Nanaimo Employees is approximately $200,000. The estimated aggregate quarterly payment to Mackenzie Employees is approximately $100,000. The Debtors estimate that, as of both the Canadian Filing Date and the Petition Date, the amount outstanding under the Pulp Price Trigger Bonus for the third quarter of 2007 is approximately $300,000, with $100,000 outstanding with respect to Employees at Mackenzie, and $200,000 outstanding with respect to Employees at Nanaimo.

(b)     Retention Plan

38.     The Debtors maintain a retention plan (the "Retention Plan") for Pope & Talbot non-insider key Employees pursuant to which each eligible Employee is entitled to a

---

[15]     This Motion contains a summary of the terms of the Pulp Price Trigger Bonus and Retention Bonus (each defined below). The complete terms and conditions of each obligation are as set forth in the underlying agreements.

bonus payment on each of December 31, 2007, March 31, 2008, June 30, 2008, September 30, 2008 and December 31, 2008 (each a "Vesting Date") in an amount equal to 10% of the Employee's base salary effective as of October 1, 2007, paid in cash in a lump sum on the 15th day of the calendar month following the next applicable Vesting Date. No amounts currently are owing under the Retention Plan and the Debtors are not seeking any authorization with respect to the Retention Plan at this time.

### 13. Director and Executive Officer Benefits

(a) Supplemental Executive Retirement Plans

39. Pope & Talbot maintains a supplemental retirement program (the "SERP"), which is a nonqualified and unfunded pension program intended to augment the participating executives' benefits under the Company's pension plans. Under the current plan, all executive officers hired since 1989 are eligible to participate in the SERP, and three of Pope & Talbot's current executives are eligible for an early retirement benefit under the SERP. The Debtors intend to continue the SERP for the benefit of current executive Employees (but not Retirees). No amounts currently are outstanding under the SERP with respect to current executive officers.

(b) Director Compensation Policies

40. Non-employees who serve as directors on the board of directors of Pope & Talbot (the "Board") each receive an annual cash retainer of $50,000 and a fee of $1,500 for each Board or committee meeting attended either in person or by teleconference (a "Meeting Fee"). Also, the chairman of the Board receives a $50,000 annual cash retainer, the chairman of the audit committee receives a $10,000 cash retainer, and each of the chairmen of the other board

committees receives a $7,500 annual cash retainer. All annual Board payments were made in May 2007 and, therefore, as of the Petition Date, no annual Board payment amounts remain outstanding. There have been three additional Board meetings for which fees remain unpaid to the Board's six non-employee directors as of the Petition Date; therefore, as of the Petition Date, the total amount outstanding to directors with respect to Board meetings is $24,000. Employees who serve as directors on the Board of Pope & Talbot receive no additional compensation for their service on the Board.

**F.**   **Workers' Compensation Program**

41.     Under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors (the "Workers' Compensation Programs"). In the United States,[16] the Debtors' insurance policy with Liberty Northwest (the "Liberty Northwest Policy") covers all of the Employees in Oregon, including Employees at the Debtors' headquarters and the Halsey mill. The Debtors pay quarterly premiums of approximately $87,500 under the Liberty Northwest Policy. The Debtors estimate that, as of the Petition Date, there are no amounts outstanding with respect to the Liberty Northwest Policy.

42.     In South Dakota, the Debtors maintain a workers' compensation policy with Midwest Employers that covers Employees' workers compensation claims up to $2 million, subject to a $600,000 deductible payable by Pope & Talbot, for each Employee. The Debtors' umbrella policy covers any claims over $2 million up to $75 million. The Debtors paid a

---

[16]    In Canada, workers' compensation is paid through a government fund, as described in more detail above.

premium of approximately $70,200 in advance in May 2007 under the Midwest Employers policy. As of both the Canadian Filing Date and the Petition Date, the Debtors believe that they owe approximately $740,000 with respect to workers' compensation claims subject to the deductible at the Spearfish facility.

43.     The Debtors have one Employee in Washington and three in Wyoming at the Debtors' "reload" sites, where those Employees provide security services or assist in loading the Debtors' products onto railways from the various mill sites. Workers' compensation coverage for Employees in Washington and Wyoming is provided through state-sponsored insurance funds to which Pope & Talbot pays aggregate quarterly premiums of approximately $2,900. The Debtors estimate that, as of the Petition Date, there are no amounts outstanding with respect to workers' compensation coverage for Employees in Washington and Wyoming.

## G.     Third-Party Administrative Costs

44.     As is customary in the case of most large companies, and as referred to above, the Debtors in the ordinary course of business utilize the services of certain third-party administrators to whom they outsource tasks associated with the payment of benefits to Employees and Retirees. Those administrative services include administering or assisting in the administration of the Debtors' benefit plans, pension plans, and workers' compensation obligations; facilitating the administration and maintenance of their books and records; assisting with legal compliance issues; and conducting special administrative and legal compliance projects in respect of Employee and Retiree benefit plans and programs (costs associated therewith, the "Third-Party Administrative Costs"). The ordinary course services provided by those third-party administrators ensure that the Debtors' obligations with respect to Employees

and Retirees continue to be administered in the most cost-efficient manner and comply with all applicable laws. The Debtors estimate that, as of the Canadian Filing Date, the amount outstanding as a result of Third-Party Administrative Costs was approximately $28,500, of which approximately $19,500 was outstanding with respect to services related to Pope & Talbot Employees, and approximately $9,000 was outstanding with respect to services related to Pope & Talbot Ltd. Employees. The Debtors estimate that, as of the Petition Date, the amount outstanding as a result of Third-Party Administrative Costs is approximately $43,000, of which approximately $29,000 is outstanding with respect to services related to Pope & Talbot Employees, and approximately $14,000 is outstanding with respect to services related to Pope & Talbot Ltd. Employees.

### Jurisdiction

45.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105(a), 363(b), 507(a)(4), 507(a)(5), 1107(a) and 1108 of the Bankruptcy Code.

### Relief Requested

46.     The Debtors submit this Motion seeking entry of an order, *inter alia*, authorizing but not directing the Debtors to: (i) pay all prepetition wages, salaries and other accrued compensation to Employees,[17] Retirees and non-employee directors, reimburse Contract

---

[17]     Including, without limitation, honoring all obligations to Union Employees in the ordinary course of business and in accordance with the terms and conditions of the CBAs.

Service Personnel for wages attributable to individuals providing services to the Debtors and pay

all prepetition Sales Commissions to Sales Agents; (ii) reimburse all prepetition Reimbursable

Expenses; (iii) make all payments with respect to Deductions and Payroll Taxes; (iv) make all

contributions to prepetition Employee and Retiree Benefit Programs and continue such programs

in the ordinary course of business; (v) honor Workers' Compensation Program obligations; and

(vi) pay all Third Party Administrative Costs relating to the foregoing payments and

contributions (collectively, and as more fully described herein, the "Employee Wages and

Benefits"), in an aggregate amount not to exceed $23.5 million, including for amounts incurred

but not paid after the Canadian Filing Date and prior to the Petition Date[18] (the "Payment

Cap").[19]

47.     The Debtors submit to the Court that, although they are seeking relief

herein on behalf of all Debtors, given the unique treatment of matters affecting Employees under

the Bankruptcy Code (and U.S. non-bankruptcy federal and state laws) and the CCAA (and

applicable Canadian federal and provincial laws), deference to the Canadian Court with respect

to the relief requested herein as it pertains to Employees of Pope & Talbot Ltd. (and the other

Canadian Debtors) may be appropriate.

48.     To assist in the implementation of the relief requested with respect to the

Employee Wages and Benefits, the Debtors further request that banks be authorized to honor

---

[18]   Pursuant to the Motion for Order Authorizing Continued Payment of "Gap Claims" that Arose After the Canadian Filing Date but Before the Commencement of These Chapter 11 Cases and Proposing a Cross-Border Insolvency Protocol filed contemporaneously herewith, the Debtors have requested authorization to continue to pay claims incurred but not paid during the "gap period" between the Canadian Filing Date and the Petition Date.

[19]   The Debtors reserve the right to seek to increase the Payment Cap at a later date.

(a) prepetition payroll checks or wires and (b) all other checks or wires issued for payments approved by this Motion, regardless of whether such checks or wires were drawn prior to or after the Petition Date. In this regard, the Debtors request that the Banks be authorized to honor all representations from the Debtors as to which checks should be honored or dishonored. Moreover, the Debtors seek authorization to reissue prepetition checks or wires for payments approved by this Motion that are dishonored notwithstanding the foregoing authorizations. Although the Debtors seek the authority to make the requested payments, they do not believe that it is appropriate that they be directed to pay any specific claim.[20]

49. The relief requested herein is consistent with the CCAA Stay as imposed by the CCAA Initial Order, which provides, *inter alia*, that (i) the Canadian Debtors "shall be entitled but not required to pay ... all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses and expenses payable on or after the date of [the CCAA Initial] Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements," whether incurred prior to or after [the CCAA Initial Order], and (ii) the Canadian Debtors "shall remit, in accordance with legal requirements, or pay... statutory deemed trust amounts in favour of the [federal government or any provincial government] or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, ... and (iv) income taxes." CCAA Initial Order ¶¶ 7, 9. Accordingly,

---

[20] Nothing contained herein is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an implication or admission that any particular claim is of a type specified or defined hereunder; or (v) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

since the Canadian Filing Date, the Debtors and their Employees have been proceeding on the basis that the payment in full of all wages, salaries, employee and pension benefits, vacation pay, bonuses and expenses was authorized. Should the relief requested herein be denied, it would undermine that expectation and likely would cause significant confusion among Employees that would result in harm to the Debtors and their estates.

### Basis For Relief and Applicable Authority

50.     It is essential that the Debtors be permitted to continue to honor their Employee Wages and Benefits obligations to ensure the continued operation of the Debtors' business and to maintain the morale of their Employees, many of whom otherwise may be unable to meet personal obligations. Similarly, it is critical that the Debtors retain the services of the Contract Service Personnel and Sales Agents who are critical to the Debtors' operations. Without the requested relief, the Employees, Contract Service Personnel and Sales Agents may seek alternative employment opportunities or engagements or refuse to provide services to the Debtors, which could jeopardize the Debtors' ability to continue their business operations and to reorganize. If there were to be any disruptions in payments to Employees, or benefits were not continued to the same extent as was approved in the CCAA Initial Order, it would significantly undermine employee relations and morale at a critical time in a manner that could result in substantial, and potentially irreparable, harm to the Debtors and their businesses.

### A.    The Requested Relief has Multiple Statutory Bases

51.     The requested relief is well within the scope of section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The

purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 *Collier on Bankruptcy* ¶105.01, at 105-6 (15th ed. rev. 2004). Courts frequently apply section 105(a) to authorize substantially similar relief to that requested herein. *See Michigan Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (affirming a bankruptcy court order authorizing the debtor to pay pre-bankruptcy wages, salaries, employee benefits and reimbursements, and workers' compensation claims and premiums); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (authorizing the debtor to pay current employees' pre-bankruptcy wages, salaries, medical benefits and business expense claims). In so ruling, courts typically rely on the "necessity of payment" rule, first enunciated by the Supreme Court in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), by which courts may authorize a debtor to make postpetition payments with respect to prepetition claims where such payments are necessary for the preservation of the estate. *See In re Lehigh & New England Ry.* **Co.**, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Pension Benefit Guarantee Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. W.D. Pa. 1993) (applying the "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval); *Ionosphere Clubs*, 98 B.R. at 176 (doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor"); **see also** *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A.*

*Phillips, Inc.)*, 29 B.R. 391, 394-95 (S.D.N.Y. 1983) (upholding the bankruptcy court's order authorizing the debtor to make postpetition payment of prepetition claims in the ordinary course without notice and a hearing).

52.     The Court also may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363 provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363, a court may authorize a debtor to pay certain prepetition claims. *See, e.g., FV Steel and Wire Co.*, Case No. 04-22421 (Bankr. E.D. Wis. 2004) (authorizing the continuation of customer programs and the payment of prepetition claims under section 363 of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191, 91-93 (Bankr. N.D. Ill. 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction).  To obtain relief under section 363(b) of the Bankruptcy Code, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." *In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  The Debtors' request to pay prepetition amounts related to Employee Wages and Benefits easily meets that standard because the failure to do so could have a material adverse impact on the Debtors' day-to-day operations.

53.     Finally, authority for payments of prepetition obligations also may be found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors in possession with authority to continue operating their businesses.  At times, that duty and the concomitant fiduciary duty to maximize estate value, only may be fulfilled through the pre-plan payment of

certain unsecured claims. *See, e.g., In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

**B.    Payment of Priority Claims Will Not Materially Prejudice Other Creditors**

54.    The Debtors believe that the prepetition wages and other employee benefits that the Debtors seek authority to fund hereunder would be entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for –
>
> (A)    wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual....

11 U.S.C. § 507(a)(4).[21]  Section 507(a)(5) accords priority in payment for:

> allowed unsecured claims for contributions to an employee benefit plan –
>
> (A)    arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B)    for each such plan, to the extent of –
>
> > (i)    the number of employees covered by each such plan multiplied by $10,950; less
> >
> > (ii)    the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan....

11 U.S.C. § 507(a)(5).[22]

---

[21]    The dollar amounts referenced in Bankruptcy Code section 507(a) were automatically adjusted, pursuant to section 104(b), as of April 1, 2007.

55.     No Employee is expected to have an Unpaid Employee Compensation claim that exceeds the $10,950 priority cap set forth in section 507(a)(4) of the Bankruptcy Code.[23] As a result, with respect to claims for Unpaid Employee Compensation and Employee Benefits, the relief requested herein, if granted, would not alter the ultimate recovery by Employees or the rights of the Debtors' other unsecured creditors, but merely affect the timing of such payments.  Similarly, on average, the amount due with respect to Employee Benefits is approximately $8,695 per Employee, which is less than the $10,950 per employee priority cap set forth in section 507(a)(5) of the Bankruptcy Code.

**C.     Applicable Bankruptcy, Non-Bankruptcy and Canadian Law Requires Payment and Continuation of Certain of the Employee Wages and Benefits**

56.     The Deductions and the Payroll Taxes principally represent Employee earnings that government entities (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks or that the Debtors are required to pay to government entities on behalf of their Employees.  If the Debtors are unable to remit those amounts, the Employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments.  Most, if not all, of the

---

[22]     The costs of administering employee benefits programs also are entitled to priority under section 507(a)(5) of the Bankruptcy Code.  *See Allegheny Int'l, Inc. v. Metro. Life Ins. Co.*, 145 B.R. 820 (W.D. Pa. 1992).  In *Allegheny*, the court found that prepetition fees of a plan administrator were entitled to priority under section 507(a)(4) of the Bankruptcy Code.  The court stated that "[i]t would be useless to prioritize expenses for contributions to an employee benefit plan and not prioritize the expenses necessary to administer those plans."  *Id.* at 822-23.

[23]     To the extent that an Employee does have a claim for Unpaid Employee Compensation or Employee Benefits that exceeds the $10,950 section 507(a)(4) or 507(a)(5) cap (including, without limitation, as a result of becoming entitled to a cash payout for accrued but unused vacation time upon termination or otherwise), by this Motion, the Debtors only seek authority to honor such claim up to the $10,950 statutory cap.  The Debtors, however, reserve the right to request authority to honor any claim that exceeds the $10,950 cap.

unremitted Deductions and Payroll Taxes constitute moneys held in trust and are not property of

the Debtors' bankruptcy estates. With respect to any such amounts held in trust, the Debtors

believe that they both are entitled and required to continue directing such funds to the

appropriate parties. *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 98-99 (3d Cir. 1994)

(state law requiring debtor to withhold city income tax from its employees' wages created trust

relationship between debtor and city for payment of withheld taxes); *DuCharmes & Co. v.*

*Michigan (In re DuCharmes & Co.)*, 852 F.2d 194,195-96 (6th Cir. 1988) (noting the special

liabilities for failure to pay trust fund taxes).

57.     Similarly, maintaining the Workers' Compensation Program is justified

because applicable state law mandates that the Debtors provide workers' compensation benefits

to their Employees in the U.S.[24] If the Debtors were forced to cease operations in locations

where they lacked required workers' compensation insurance, substantial revenue loss could

result and the Debtors' ability to supply their customers would be jeopardized.

58.     With respect to Retirees, many of the benefits sought to be honored by this

Motion would be protected under section 1114 of the Bankruptcy Code, and therefore would

require modification by agreement or by order of the Court. In addition, failure to pay Retirees

at this time could negatively affect the morale of the Debtors' current workforce, because the

Debtors' loyalty to its Employees after they retire will be called into question.

59.     The Employee Wages and Benefits represent a competitive but reasonably

limited set of policies and are necessary to retain the skilled and motivated workforce necessary

---

[24]     Furthermore, failure to satisfy Workers' Compensation Claims could have a devastating effect on the financial
well-being and morale of the Employees and their willingness to remain in the Debtors' employ.

to operate the Debtors' business profitably. Accordingly, based on the foregoing facts and authorities, the Debtors submit that the relief requested herein should be granted.

60.     In addition, under Canadian law, directors of a Canadian corporation potentially have personal liability for the failure of the corporate entity to pay wages and other payroll related expenses — including amounts due with respect to accrued vacation. Accordingly, continuing the payment of Employee Wages and Employee Benefits will help to mitigate the risk of personal liability of directors for such amounts.

## Notice

61.     Notice of this Motion has been provided to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Canadian Monitor; (iii) the agents under the Debtors' proposed postpetition secured debtor in possession credit facility; (iv) the agents under the Secured Credit Facility; (v) the indenture trustees for the Notes; (vi) the Purported Ad Hoc Bondholders Committee; and (vii) the 30 largest unsecured creditors in these chapter 11 cases on a consolidated basis. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered respecting this Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

62.     The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully seek entry of an order, in substantially the form attached hereto as Exhibit A, *inter alia*, (i) authorizing but not directing the Debtors to (a) pay all prepetition wages, salaries and other accrued compensation to Employees and Retirees, reimburse Contract Service Personnel for wages attributable to individuals providing services to the Debtors and pay prepetition Sales Commissions to the Sales Agents, (b) reimburse all prepetition Reimbursable Expenses, (c) make all payments with respect to prepetition payroll Deductions or Payroll Taxes, (d) make all contributions to prepetition Employee and Retiree Benefit Programs and continue such programs in the ordinary course of business, (e) honor Workers' Compensation Program obligations and (f) pay all Third-Party Administrative Costs relating to the foregoing payments and contributions; (ii) (x) authorizing banks and other financial institutions to honor prepetition payroll and employee benefit checks and transfers made prior to or after the Petition Date, and to process and honor all other checks issued for payments approved by this Motion, (y) authorizing the Banks to honor all representations from the Debtors as to which checks should be honored or dishonored,

(z) authorizing the Debtors to reissue checks for payments approved by this Motion where the applicable check is dishonored postpetition; and (iii) granting such other and further relief as is just and proper.

DATED: NOVEMBER 19, 2007

SHEARMAN & STERLING LLP
Fredric Sosnick
Douglas P. Bartner
Susan A. Fennessey
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Email: fsosnick@shearman.com
dbartner@shearman.com
sfennessey@shearman.com

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
joneill@pszjlaw.com
tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and
Debtors in Possession