# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POPE & TALBOT, INC., et al.,[1] | ) | Case No. 07-11738 (___) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**MOTION FOR AN ORDER (I) ESTABLISHING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN ASSETS OF POPE & TALBOT, INC., POPE & TALBOT LTD., POPE & TALBOT LUMBER SALES, INC., AND POPE & TALBOT SPEARFISH LIMITED PARTNERSHIP RELATED TO THEIR WOOD PRODUCTS BUSINESS; (II) AUTHORIZING AND SCHEDULING AN AUCTION IN CONNECTION WITH THE SALE; (III) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (IV) APPROVING CURE COST PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; (V) APPROVING FORM AND MANNER OF NOTICES; AND (VI) SCHEDULING A HEARING FOR FINAL APPROVAL OF THE SALE**

Pope & Talbot, Inc. ("Pope & Talbot"), on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), including Pope & Talbot Ltd., Pope & Talbot Lumber Sales, Inc. and Pope & Talbot Spearfish Limited Partnership (collectively, and with Pope & Talbot, the "Sellers"), hereby submit this motion (this "Procedures Motion") for the entry of an order (the "Proposed Procedures Order"): (i) establishing the bidding procedures to govern the Auction (as defined below), which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Pope & Talbot, Inc. (7139); Penn Timber, Inc. (7380); Pope & Talbot Lumber Sales, Inc. (7029); Pope & Talbot Pulp Sales U.S., Inc. (2041); Pope & Talbot Relocation Services, Inc. (9015); Pope & Talbot Spearfish Ltd. Partnership (2569); P&T Power Company (2710); Mackenzie Pulp Land Ltd. (CCID No. 625473); Pope & Talbot Ltd. (3102); P&T Factoring Limited Partnership (1538); P&T Finance One Limited Partnership (8395); P&T Finance Three LLC (2468); P&T Finance Two Limited Partnership (7960); P&T Funding Ltd. (3717); and P&T LFP Investment Limited Partnership (None). The address for all Debtors is 1500 SW First Avenue, Suite 200, Portland, Oregon 97201.

Date 11-19-07
Docket # 10

procedures are set forth in <u>Exhibit A</u> to the Proposed Procedures Order (the "Bidding Procedures"); (ii) authorizing and scheduling an auction (the "Auction") at which the Sellers, in accordance with the Bidding Procedures, will solicit higher or better bids for certain of the assets of the Sellers' wood products business; (iii) approving those provisions of the Asset Purchase Agreement, dated as of November 19, 2007, among the Sellers and the Stalking Horse Bidder (as defined below) (the "Stalking Horse Purchase Agreement") that provide for payment of a break-up fee to International Forest Products Limited (the "Stalking Horse Bidder" or the "Purchaser") and reimbursement of the Stalking Horse Bidder's out-of-pocket expenses; (iv) approving the procedure to determine, and the form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the executory contracts and unexpired leases to be assumed by the applicable Seller and assigned to the Stalking Horse Bidder or the successful bidder at the Auction; (v) approving the form and manner of notices of the proposed sale to the Stalking Horse or to the successful bidder at the Auction, the Bidding Procedures, the Auction and the sale approval hearing (the "Sale Hearing"); and (vi) scheduling the Sale Hearing.[2] In support of this Procedures Motion, the Sellers respectfully represent and set forth as follows:

---

[2] Capitalized terms used but not defined in this Procedures Motion shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement. To the extent there are inconsistencies between this Procedures Motion and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control.

## Background

1.      On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition in the Court for relief under chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtors continue to operate their

business and manage their properties as debtors in possession pursuant to sections 1107 and 1108

of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' cases. As of

the date hereof, no creditors' committee has been appointed.

2.      On October 29, 2007 (the "Canadian Filing Date"), certain of the Debtors

— Pope & Talbot, Pope & Talbot Ltd., Mackenzie Pulp Land Ltd., Penn Timber, Inc., Pope &

Talbot Lumber Sales, Inc., Pope & Talbot Pulp Sales U.S., Inc., Pope & Talbot Relocation

Services, Inc., P&T Power Company, P&T Finance Three LLC and P&T Funding Ltd.

(collectively, the "Canadian Debtors") — applied for protection from their creditors in Canada

pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (Canada) (the

"CCAA"; and the cases commenced by the Canadian Debtors thereunder, the "CCAA

Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian

Court"). On the same date, the Canadian Court issued an "initial order" (the "CCAA Initial

Order") pursuant to which it, *inter alia*, granted the application of the Canadian Debtors for

protection under the CCAA, imposed a stay of all proceedings (the "CCAA Stay") against the

Canadian Debtors and their property, created certain administrative liens, appointed

PricewaterhouseCoopers Inc. as monitor (the "Canadian Monitor") in the CCAA Proceedings,

and set forth certain other limitations and procedures for all parties in interest in the CCAA

Proceedings. A copy of the CCAA Initial Order is attached to the Stanton Declaration (as defined below) as Exhibit A.

3.     Pope & Talbot, which was founded in 1849, is the direct or indirect corporate parent of all of the other Debtors and their non-debtor affiliates (collectively, the "Company"). The Company is headquartered in Portland, Oregon, and currently conducts business in two operating segments: (i) pulp, the principal raw material used in the manufacture of paper products, which the Company produces in three of its mills (two in British Columbia and one in Oregon), and (ii) wood products (i.e., lumber), which the Company produces in four of its mills (three in British Columbia and one in South Dakota).

4.     Additional factual background relating to the Debtors' business and the commencement of these chapter 11 cases and the CCAA proceedings is set forth in detail in the Declaration of Harold N. Stanton in Support of First Day Motions, sworn to on November 19, 2007 (the "Stanton Declaration"), filed with this Court and incorporated herein by reference.

**Facts**

A.     **The Proposed Sale Transaction**

5.     The Company has conducted an extensive search for a qualified buyer of its assets. In August 2007, the Company, with the assistance of Rothschild Inc. ("Rothschild"), launched a bid solicitation process (the "Bid Solicitation Process") seeking bids for its entire business, the wood products business as a unit, or the pulp business as a unit. In connection with the Bid Solicitation Process, Rothschild contacted 84 potentially interested parties, which included both financial investors and strategic purchasers. Sixty-eight of these parties received a

"teaser" package and a form of confidentiality agreement (collectively, the "Potentially Interested Parties"). Nineteen of the Potentially Interested Parties executed a confidentiality agreement and received a confidential offering memorandum prepared by Rothschild.

6.     On or around the week of September 10, 2007, the Company, through Rothschild, received preliminary non-binding expressions of interest (each, an "EOI") from eight prospective purchasers (collectively, the "Prospective Bidders") of either the whole business, the wood products business or the pulp business. Five of the Prospective Bidders were invited to conduct due diligence on the assets described in their respective EOIs, including site visits to the Debtors' mills.

7.     During the week of October 8, 2007, the Company, through Rothschild, received binding proposals (the "Binding Proposals") from four of the five Prospective Bidders. The Company, in consultation with its advisors, determined that the Binding Proposal submitted by the Stalking Horse Bidder was the highest and best offer received in respect of the assets to which it related. For the reasons stated in the Stanton Declaration, the Sellers' boards of directors determined, in the exercise of their business judgment, to consummate the transaction with the Stalking Horse Bidder pursuant to the terms and conditions of the Stalking Horse Purchase Agreement, subject to higher or better bids that may be obtained pursuant to the auction process proposed in this Procedures Motion.

8.     The Stalking Horse Purchase Agreement, described below and attached hereto as Exhibit A,[3] reflects the terms and conditions on which the Stalking Horse Bidder has

---

[3] The Stalking Horse Purchase Agreement attached as Exhibit A does not include certain exhibits that include confidential commercial information. Such exhibits will be made available upon request, to Qualified Bidders, and to the Creditor Representatives.

agreed to purchase certain of the assets of the Sellers that are employed in the wood products

business (the "Wood Products Business"), and to assume certain related liabilities.[4]  The

Principal Purchased Assets are assets that related to the Debtors' mills in Spearfish, South

Dakota, Castelga, and British Columbia, and Grand Forks British Columbia.  The mills located

in Fort St. James and Midway, British Columbia, and related assets were not included in the bid

made by the Stalking Horse Bidder, and are therefore not included in the Stalking Horse

Purchase Agreement.

       9.     The principal terms of the Stalking Horse Purchase Agreement are, in

summary, as follows:[5]

      (i)    Purchase Price.  The Purchase Price is equal to the sum of (a) $69 million (the "Cash Portion"), plus (b) the Actual Price Adjustment, minus (c) the Cure Costs, minus (d) the Landfill Price Adjustment, minus (e) any Wind-up Deficiency.  The Actual Price Adjustment, which the Debtors currently estimate to be approximately $20 million, will be determined in accordance with the procedures set forth in Section 2.08 of the Stalking Horse Purchase Agreement, and is based on the value of, among other things, the Raw Materials, Finished Goods and Residuals Inventories on hand as of the Effective Time, and certain deposits under Cutting Contracts and Assigned Contracts.  The Cure Costs are the cure and reinstatement costs associated with the assumption of the Assigned Contracts.  The Purchaser is obligated to pay all Cure Costs when due pursuant to Section 2.09(a) of the Stalking Horse Purchase Agreement.  The amount of the Landfill Price Adjustment is $4 million.  The Wind-Up Deficiency, if any, is in respect of the funding deficiency as of the Closing Date under the PTL Retirement Plan for Employees represented by the Canadian Merchant Service Guild (the "CMSG Plan") and cannot, in any event, exceed Cdn$1,582,000.

      (ii)   Deposit.  The Purchaser is required to provide a deposit of $8.8 million (the "Deposit") within two business days of execution of the Stalking

---

[4]  The Debtors, pursuant to a separate motion, are seeking approval for sale procedures with respect to such mills and related assets.

[5]  This Procedures Motion contains only a summary description of certain terms of the Stalking Horse Purchase Agreement.  Parties are directed to the Stalking Horse Purchase Agreement for a full recitation of its terms.

Horse Purchase Agreement, which deposit will be held in escrow pursuant to Section 2.06(a) of the Stalking Horse Purchase Agreement. The Deposit is an amount equal to approximately 10% of the Cash Portion plus the current estimate of the Actual Price Adjustment (the "Estimated Adjusted Purchase Price").

(iii)    <u>Purchased Assets</u>. The Purchased Assets are to be purchased by the Stalking Horse Bidder free and clear of all Liens other than Permitted Encumbrances. Section 2.01(a) of the Stalking Horse Purchase Agreement defines the term Purchased Assets, and the Purchased Assets to include: (a) the Owned Real Property and all of the Sellers' right, title and interest in and to the Leased Real Property; (b) all tangible personal property owned by the Sellers and used primarily in the conduct of the Business, including equipment, machinery, trucks, cars, other vehicles, rolling stock and marine vehicles, (c) all Inventories, other than vendor-managed inventories which are maintained, held or stored by any of the Sellers' customers on behalf of any of the Sellers, (d) the Transferred Intellectual Property (to the extent transferable), and (e) all of the Sellers' right, title and interest in and to the Assigned Contracts (to the extent such contracts are transferable).

(iv)    <u>Excluded Assets</u>. The Purchase Assets do not include the Excluded Assets. The Excluded Assets include: (a) all accounts receivables, notes and other amounts receivable from third parties, including customers, arising from the conduct of the Business before the Closing, (b) all vendor-managed inventories which are maintained, held or stored by any of the Sellers' customers or third party warehouses on behalf of any of the Sellers, (c) all rights to tax refunds, credit or similar benefits attributable to all taxes relating to the Purchased Assets or the Business for any Pre-Closing Period, and (d) all rights, demands, claims and actions, including without limitation, causes of action constituting avoidance actions or other claims of the Sellers' estates under chapter 5 of the Bankruptcy Code.[6]

(v)    <u>Assumed Liabilities</u>. The Purchaser will not assume any liabilities of the Sellers except as expressly set forth in the Stalking Horse Purchase Agreement. In addition to assuming the Forestry Services (as described below), and being obligated to pay the Cure Costs, the Purchaser will assume the Assumed Liabilities, which include: (a) all liabilities and obligations of the Sellers under the Real Property Leases and licenses, the Assigned Contracts, and the Permits and Licenses (other than the Excluded Permits or Licenses), in each case arising from the Closing Date; (b) all liabilities and obligations of the Sellers under the Permitted Encumbrances arising from and after the Closing Date; (c) all liabilities in

---

[6] As noted above, the Debtors' Fort St. James, British Columbia and Midway, British Columbia lumber mills are not Purchased Assets.

respect of the CMSG Plan; (d) all liabilities of the Sellers relating to Grand Forks Railway Company; (e) all Environmental Liabilities of the Sellers in respect of the Owned Real Property, the Leased Real Property and any area used pursuant to the Permits and Licenses; and (f) all other liabilities and obligations arising in connection with the ownership, operation, and use of the Purchased Assets from and after the Closing Date.

(vi)   Forestry Services.  Pursuant to the Section 2.10(b) of the Stalking Horse Purchase Agreement, the Purchaser will assume and agree to perform all of the Forestry Services, which are all silviculture, reforestation, road deactivation and road reclamation liabilities and other post-harvest obligations associated with the rights of the Sellers to harvest timber from the lands owned by the Province of British Columbia, Canada, that relate to attaining the applicable reforestation or road deactivation standards for any harvested tracts or roads.  The Sellers are to pay to the Purchaser (in accordance with the procedure set forth in Section 2.10) the amount of the Forestry Services Amount as of the anticipated Closing Date.

(vii)   Assignment of Contracts and Leases.  Pursuant to Section 5.04 of the Stalking Horse Purchase Agreement, the Sellers will assume and assign the Assigned Contracts to the Purchaser.

(viii)   Cure Costs.  The Purchasers are obligated to pay all Cure Costs; *provided, however*, that the Cash Portion shall be reduced in an amount equal to all Cure Costs paid by the Purchasers.  In the event that any Cure Costs are not determined pursuant to a final order of this Court or the Canadian Court or agreement between the applicable Seller and the non-debtor counterparty to the contract or lease as of two Business Days prior to the Closing Date, then the Purchaser shall deposit into escrow cash in the aggregate amount of all Cure Costs asserted by the non-debtor counterparties.

(ix)   Break-Up Fee.  The Purchaser will be entitled to payment of a $3.2 million fee the "Break-up Fee") if the Purchaser is not in material breach of the Stalking Horse Purchase Agreement (and has not otherwise terminated the Stalking Horse Purchase Agreement by agreeing to its termination pursuant to Section 8.01(e) of such agreement), and (a) this Court and the Canadian Court approve a bid other than the Purchaser's Bid, and the closing of a transaction in respect of such other bid has occurred, or (b) the Sellers withdraw this Procedures Motion and the corresponding request for relief from the Canadian Court, and subsequently liquidate or otherwise dispose of the Purchased Assets, in one or a series of transactions.

(x)   Expense Reimbursement.  The Purchaser will be entitled to reimbursement for its documented, out-of-pocket expenses reasonably incurred in

connection with the transactions contemplated by the Stalking Horse Purchase Agreement, in an aggregate amount not to exceed $700,000 (the "Expense Reimbursement"). The Expense Reimbursement will only be paid to the Purchaser if (a) the Purchaser is not in breach or default of any provision of the Stalking Horse Purchase Agreement, and (b) the Purchaser has not otherwise terminated the Stalking Horse Purchase Agreement by agreeing to its termination pursuant to Section 8.01(e) of such agreement, and (c) either (1) this Court and the Canadian Court approve a bid other than the Purchaser's Bid, and the closing of a transaction in respect of such other bid has occurred, or (2) the Sellers withdraw this Procedures Motion and the corresponding request for relief from the Canadian Court, and subsequently liquidate or otherwise dispose of the Purchased Assets, in one or a series of transactions.

10.    The Debtors believe that the Stalking Horse Bidder does not have any interest with respect to this transaction that is materially adverse to those of the Debtors, their estates or other creditors, and will verify the same with respect to any bidder at the Auction. Moreover, after extensive analysis of all the bids submitted, the Debtors believe that the terms and conditions of the Stalking Horse Purchase Agreement are fair and reasonable and comparable to terms of similar agreements in sales of comparable assets. In particular, the Debtors respectfully submit that no competing offeror at comparable price and terms would be willing to go forward as a stalking horse without the protection of a break-up fee and expense reimbursement, as described more fully below, in the event that it is outbid at the Auction.

**B.    The Bidding Procedures**

11.    In the Stalking Horse Purchase Agreement, the Sellers and the Stalking Horse Bidder agreed to the Bidding Procedures summarized herein and set forth on Exhibit 5.01 of the Stalking Horse Purchase Agreement and in Exhibit A to the Proposed Procedures Order.

By this Procedures Motion, the Sellers seek approval of the Bidding Procedures, which provide

in relevant part as follows:[7]

> (i) <u>Qualifying Bidders</u>.  In order to participate in the Bidding Process, each Person (a "Potential Bidder"), other than the Purchaser, must deliver to the Sellers:  (i) an executed confidentiality agreement in form and substance satisfactory to the Sellers; and (ii) the most current audited and latest unaudited financial statements (together, the "Financial Information") of such Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of purchasing the Business, then:  (a) the Financial Information of the equity holder(s) of the Potential Bidder or such other form of financial disclosure acceptable to the Sellers, following consultation with the Creditor Representatives;[8] and (b) the written commitment of such equity holder(s) to be responsible for the Potential Bidder's obligations in connection with the purchase of the Business (collectively, the "Participation Requirements").
>
> A "Qualifying Bidder" is a Potential Bidder that satisfies the Participation Requirements, and which the Sellers, in their business judgment and after consultation with the Creditor Representatives, determine is financially able to consummate the purchase of the Purchased Assets and the assumption of the Assumed Liabilities in a timely manner.  Within two Business Days after receipt from the Potential Bidder of the materials required in connection with the Participation Requirements, the Sellers shall notify the Potential Bidder in writing, with a copy to the Purchaser, whether such Potential Bidder is a Qualifying Bidder, and shall deliver to such Qualifying Bidder the Offering Memorandum and a copy of the Stalking Horse Purchaser Agreement.
>
> (ii) <u>Overbid Requirements</u>.  A bid or offer received from a Qualified Overbidder will constitute a "Qualified Overbid" only if such bid or offer includes all of the Qualified Overbid Documents (as defined below), meets all of the Qualified Overbid Requirements (as set forth in the Bidding Procedures), and is accompanied by the Good Faith Deposit (as defined below).  Notwithstanding anything to the contrary herein, the

---

[7]  This Procedures Motion contains only a summary description of the Bidding Procedures.  Parties are directed to the Bidding Procedures attached as <u>Exhibit A</u> to the Proposed Procedures Order for a full recitation of its terms.

[8]  The Creditor Representatives are, collectively:  (i) representatives of the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"); (ii) the agents under the debtor-in-possession credit agreement entered into by PTI and certain of its Affiliates; (iii) the Term Loan B Agent (as defined in the Credit Agreement dated as of June 28, 2006, as amended from time to time, among Pope & Talbot, Pope & Talbot Ltd., as Borrower, several Lenders, Lehman Brothers Inc., Lehman Commercial Paper Inc., Wells Fargo Financial Corporation Canada, Ableco Finance LLC, and Ableco Finance LLC (the persons defined as "Lenders" under such Credit Agreement, collectively, the "Secured Lenders")); and (iv) the court-appointed Monitor within the Canadian Proceedings; *provided*, that if the Secured Lenders submit a Qualified Overbid, then the Term Loan B Agent shall not be a Creditor Representative.

Purchaser's bid as set forth in the Stalking Horse Purchase Agreement (the "Purchaser's Bid") will be deemed a Qualified Overbid, the Purchaser shall be deemed a Qualifying Bidder, and the Secured Lenders shall be deemed a Qualifying Bidder. In order to participate in the Bidding Process, each Qualifying Bidder, other than the Purchaser, must deliver the necessary documents outlined in the Bidding Procedures (collectively, the "Qualified Overbid Documents") to the Financial Advisor by not later than 4:00 P.M. New York time on December 14, 2007 (the "Bid Deadline").

The Qualified Overbid Documents include a written offer stating that: (i) such Qualifying Bidder offers to purchase all, substantially all, or a material part, of the Purchased Assets and to assume all, substantially all, or a material part, of the Assumed Liabilities, *provided*, that such written offer may also include an offer to purchase assets of Pope & Talbot Ltd. ("PTL") and its Affiliates that are not Purchased Assets (such assets, the "Additional Assets") and to assume liabilities of PTL and its Affiliates that are not Assumed Liabilities (such liabilities, the "Additional Liabilities")[9]; and (ii) such Qualifying Bidder's offer is irrevocable and shall remain open until the earlier of (x) the closing of a sale pursuant to such Qualified Overbid, and (y) twenty (20) Business Days after the Overbid Court Approval Date (as defined below). In addition, the Qualified Overbid Documents must include a copy of a purchase and sale agreement executed by the Qualifying Bidder, and a copy of such agreement marked to show proposed amendments and modifications to the Stalking Horse Purchase Agreement.

Accordingly, a Qualifying Bidder may submit a bid that provides for the purchase of assets that are not contemplated to be purchased, and for the assumption of liabilities that are not contemplated to be assumed, in each case pursuant to the Stalking Horse Purchase Agreement. However, notwithstanding any other provision in these Bidding Procedures, the Sellers shall be under no obligation to determine that any bid submitted by a Qualifying Bidder which includes an offer to purchase Additional Assets or to assume Additional Liabilities is a Qualified Overbid, and may, after consultation with the Creditor Representatives, determine that any such bid is not a Qualified Overbid due solely to the inclusion in such bid of an offer to purchase Additional Assets or to assume Additional Liabilities.

In addition, all bids must, among other things: (i) not be materially more burdensome or conditional than the Purchaser's Bid; and (ii) have a value greater than or equal to the sum of (a) the sum of (i) the Purchase Price (which, for the avoidance of doubt, shall include the Seller's estimate of

---

[9] For the avoidance of doubt, Additional Assets and Additional Liabilities may be assets and liabilities with respect to the Debtors' pulp business.

the Actual Price Adjustment), (ii) the Break-up Fee; (iii) the maximum amount of the Expense Reimbursement, and (iv) the Overbid Increment (as defined below); plus (b) the value to the Sellers of the assumption of the Assumed Liabilities under the Agreement, and if applicable, the Additional Liabilities; plus (c) all other consideration to the Sellers under the Agreement; minus (d) all other obligations to be satisfied by the Sellers under the Stalking Horse Purchase Agreement, including in respect of the Forestry Liabilities Amount. All Qualifying Bidders that submit a bid must deliver to the Sellers via wire transfer (or other form acceptable to the Sellers in their sole discretion) by the Bid Deadline an amount equal to ten percent of the proposed cash portion of the purchase price set forth in such bid, including, for the avoidance of doubt, any amount in respect of the Actual Price Adjustment or similar closing adjustment (the "Good Faith Deposit").

(iii)    <u>Auction</u>. If one or more Qualified Overbids are received, the Sellers will conduct the Auction with respect to the Purchased Assets and the Assumed Liabilities and, if applicable, any Additional Assets and Additional Liabilities. If no Qualified Overbid (other than the Purchaser's Bid) is received by the Bid Deadline, then the Sellers will seek entry of orders by this Court and the Canadian Court approving the sale to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement.

The Auction, if required, will commence at 10:00 a.m. New York time on December 19, 2007, at the offices of Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York, 10022, or at such later time and at such other place as the Sellers shall notify all Qualifying Bidders who have submitted Qualified Overbids and all other Persons entitled to attend the Auction.

During the Auction, bidding will begin at the purchase price stated in the highest or otherwise best Qualified Overbid, and will subsequently continue in minimum increments of at least $250,000 (the "Overbid Increment") higher than the previous Qualified Overbid. In the event any Qualified Overbid includes an offer to purchase Additional Assets and assume Additional Liabilities, the Sellers, after consultation with the Creditor Representatives, will announce the manner in which the Sellers will conduct the Auction with respect to any Qualified Overbid for the purchase of the Purchased Assets and the assumption of the Assumed Liabilities, and any Qualified Overbid that includes an offer to purchase Additional Assets and assume Additional Liabilities.

All subsequent bids submitted by the Purchaser shall be "cash only" and shall not be deemed to include a credit in an amount equal to the amount of the Break-up Fee or the Expense Reimbursement. No entity, including, without limitation, the Purchaser, may object to any Qualified Overbid on

the grounds that after deduction of the Break-up Fee or the Expense Reimbursement, such Qualified Overbid is not the highest bid.

Bidding at the Auction will continue until such time as the highest and best Qualified Overbid (the "Successful Bid") is selected as follows: immediately prior to conclusion of the Auction, the Sellers, in consultation with the Creditor Representatives, will: (i) review each Qualified Overbid on the basis of financial and contractual terms and other factors relevant to (a) the determination of which transaction is in the best interests of the creditors and estates of the Sellers and their Affiliates, and (b) the sale process, including those factors affecting the speed and certainty of consummating a transaction; and (ii) in the exercise of their business judgment, select the Successful Bid and the second highest and best Qualified Overbid (the "Back-up Bid").

Within two Business Days after the conclusion of the Auction, the Qualifying Bidder submitting the Successful Bid (the "Successful Bidder") must supplement its Good Faith Deposit such that its Good Faith Deposit equals 10% of the cash portion of the purchase price (including, for the avoidance of doubt, any amount in respect of the Actual Price Adjustment or similar closing adjustment).

(iv) <u>Court Approvals</u>. In the event that the Auction is held, the Sellers shall seek entry of the orders by this Court and the Canadian Court approving the Successful Bid and the Back-up Bid, which orders shall be sought in form and substance reasonably acceptable to the Sellers and the Qualifying Bidders submitting the Successful Bid and the Back-up Bid, respectively (the "Proposed Approval Orders").

If, following the entry of the Proposed Approval Orders by this Court and the Canadian Court, the Successful Bidder fails to consummate a transaction with the Sellers in respect of the Successful Bid because of a breach or failure to perform on the part of such Successful Bidder, then the Back-up Bid shall be deemed to be the Successful Bid, and the Sellers will be authorized, but not required, to consummate a transaction in respect of the Back-up Bid with the Back-up Bidder without further order of the Court or the Canadian Court; *provided*, that the Purchaser, if it submitted the Back-up Bid, shall purchase the Purchased Assets and assume the Assumed Liabilities on the terms and conditions set forth in the Stalking Horse Purchase Agreement, and at the final purchase price bid by the Purchaser at the Auction, without requiring further approval by this Court or the Canadian Court.

(v) <u>Return of Good Faith Deposits</u>. The Good Faith Deposits of all Qualifying Bidders will be retained by the Sellers and all Qualified Overbids will remain open until the closing of a transaction with the Successful Bidder in respect of the Successful Bid; *provided, however,*

that if no such closing occurs on or before twenty Business Days after the first date on which both Overbid Approval Orders have been entered (such first date, the "Overbid Court Approval Date"), then the Sellers shall, except as provided in the following paragraph, within twenty-five Business Days after the Overbid Court Approval Date, return or cause to be returned each Good Faith Deposit to its respective Qualifying Bidder.

(vi)    <u>Successful Bidder Failure</u>.  If the Successful Bidder fails to consummate a transaction in respect of the Successful Bid because of a breach or failure to perform on the part of such Successful Bidder and the Sellers are not then deemed to be in material breach of the applicable purchase and sale agreement, then the Sellers will not have any obligation to return the Good Faith Deposit to the Successful Bidder, and such Good Faith Deposit shall irrevocably become the property of the Sellers, and shall not be credited against the purchase price of any purchaser.

C.    <u>The Break-up Fee and Expense Reimbursement</u>

12.    In recognition of, and as an inducement for, the Stalking Horse Bidder's expenditure of time and resources, and to procure the benefits to the Sellers' estates of securing a "stalking horse" or minimum bid, the Sellers, by this Procedures Motion, seek approval of limited protections for the Stalking Horse Bidder, in the form of the Break-up Fee and the Expense Reimbursement.  Specifically, as is summarized above and set forth more fully in Sections 5.02 and 5.03 of the Stalking Horse Purchase Agreement, the Sellers seek authority to pay to the Stalking Horse Bidder a Break-up Fee in cash in the amount of $3.2 million and an Expense Reimbursement up to $700,000, in each case subject to the satisfaction of the conditions described above and set forth in the Stalking Horse Purchase Agreement.  The Break-up Fee is equal to approximately 3.6% of the Estimated Adjusted Purchase Price, assuming that the sale closes on or about January 31, 2008 and without giving effect to any deductions from the Purchase Price with respect to Cure Costs (the "Estimated Consideration").

13.    The Sellers submit that the Break-up Fee and the Expense Reimbursement provided for in the Stalking Horse Purchase Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's length. The Sellers further submit that, unless they agreed to such protections, the Sellers would not have achieved a contract as favorable to their estates as the Stalking Horse Purchase Agreement.

**D.    Notice of the Proposed Sale, Bidding Procedures, Auction and the Sale Hearing**

14.    The Sellers seek to have the Sale Hearing set for no later than January 8, 2008 which is consistent with the deadlines mandated in the Debtors' proposed post-petition financing, and proposed use of the Secured Lenders' cash collateral. Pursuant to the terms of such financing and use of cash collateral, the Debtors are required to use their reasonable best efforts to:

(a)    obtain, on or before November 30, 2007, one or more Court orders approving the procedures for the sale of all or substantially all of the Debtors' assets;

(b)    conduct, on or before December 20, 2007, one or more auctions for the sale of all or substantially all of the Debtors' assets;

(c)    obtain, on or before January 8, 2008, one or more Court orders approving the sale of all or substantially all of the Debtors' assets; and

(d)    consummate, on or before January 31, 2008, one or more sales of all or substantially all of the Debtors' assets.

15.    Not later than three business days after entry of the Proposed Procedures Order, the Sellers will cause a copy of the notice of the proposed sale to the Stalking Horse Bidder or to the Successful Bidder (the "Proposed Sale"), the Auction, the Bidding Procedures and the Sale Hearing, substantially in the form attached as <u>Exhibit B</u> to the Proposed Procedures Order (the "Notice of Auction and Sale Hearing"), and a copy of the Proposed Procedures Order

(in the form approved by the Court), to be served upon the following parties or, in lieu thereof, to their counsel, if known, by first-class mail, postage prepaid: (i) counsel for the Stalking Horse Bidder; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) counsel to any creditors' committee appointed in these chapter 11 cases (the "Committee"); (iv) the Purported Ad Hoc Bondholders Committee; (v) the agents under the Debtors' proposed postpetition secured debtor in possession credit facility; (vi) the agents under the Secured Credit Facility, (vii) the Canadian Monitor; (viii) the 30 largest unsecured creditors in these chapter 11 cases on a consolidated basis; (ix) the Potentially Interested Parties; (x) all applicable federal, state and local taxing authorities; and (xi) all known persons holding a lien on part or all of the Purchased Assets (collectively, the "Initial Notice Parties").

16.    At the Sale Hearing, the Sellers intend to seek entry of an order authorizing and approving: (i) if no Qualified Overbid is received other than that of the Stalking Horse Bidder, the transaction contemplated by the Stalking Horse Purchase Agreement, or (ii) if another Qualified Overbid is received by the Sellers, such other transaction contemplated by the Successful Bid (the "Proposed Approval Order").

17.    The Debtors respectfully submit that any objections to the entry of the Proposed Approval Order must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) set forth the name of the objectant, the nature and amount of claims or interests held or asserted by the objectant against the Debtors' estates or property, the basis for the objection, and the specific grounds therefor; (iv) be filed with this Court (the requirements set forth in (i) through (iv) being the "Objection Requirements"); and (v) be further served so that it

is received no later than 4:00 p.m. (prevailing Eastern time) on December 28, 2007 by: (a) counsel for the Sellers, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn: Fredric Sosnick, Esq. and Marc B. Hankin, Esq.), Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq. and James E. O'Neill, Esq.) and Stikeman Elliot LLP, 5300 Commerce Court West, 199 Bay Street, Toronto, Ontario M5L 1B9 (Attn: Sean F. Dunphy, Esq. and Ashley John Taylor, Esq.), (b) counsel for the Stalking Horse Bidder, Koffman Kalef LLP, 19th Floor, 885 West Georgia Street, Vancouver, BC, V6C 3H4 Canada (Attn: Douglas A. Side, Esq.), (c) the U.S. Trustee, J. Caleb Boggs Federal Building, Room 2207, 844 N. King Street, Wilmington, DE 19801, (d) financial advisors to the Sellers, Rothschild, Inc., 1251 Avenue of the Americas, 51st Floor, New York, New York, 10020 (Attn: Stephen Ledoux), (e) counsel to the Committee, (f) counsel to the agents under the Debtors' proposed postpetition secured debtor in possession credit facility and the Secured Credit Facility, Goldberg Kohn, 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603-5792 (Attn: Randall L. Klein, Esq.), and Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Adam Harris, Esq.), (g) the court-appointed Monitor within the Canadian Proceedings, PricewaterhouseCoopers Inc., 77 King Street West, Toronto, Ontario M5K 1G8 Canada (Attn: Greg Watson and Jeffrey Rosenberg), (h) counsel to the court-appointed Monitor within the Canadian Proceedings, Goodmans LLP, 250 Yonge Street, Suite 2400, Toronto ON, M5B 2M6 Canada, and (i) the 30 largest unsecured creditors in these chapter 11 cases on a consolidated basis (collectively, the "Objection Notice Parties"). The Debtors respectfully submit that failure of any person or entity to file timely its

objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Proposed Approval Order.

E.     **The Cure Costs Procedures and Cure Costs Notice**

18.     To facilitate the assumption and assignment of the Assigned Contracts, the Sellers propose to serve notice of their intention to assume and assign the Assigned Contracts and of their determination of the Cure Costs that correspond to each Assigned Contract, substantially in the form attached as Exhibit C to the Proposed Procedures Order (the "Cure Cost Notice"). The Cure Cost Notice also includes notice of the Sale Hearing. The Debtors propose to serve the Cure Cost Notice on the non-Debtor counterparties to the Assigned Contracts no later than three business days after the entry of the Proposed Procedures Order, and request that this Court approve the following procedure for fixing any Cure Costs owed with respect to the Assigned Contracts.

19.     The Sellers request that unless a non-debtor party to an Assigned Contract files an objection to the assumption and assignment of the applicable Assigned Contract or the corresponding scheduled Cure Cost as set forth in the Cure Cost Notice on or before 4:00 p.m. (prevailing Eastern time) December 20, 2007, and serves a copy of the objection so as to be received no later than such time on the same day upon the Objection Notice Parties, such non-debtor party shall (i) be forever barred and estopped from objecting to the Cure Cost set forth in the Cure Cost Notice, and from asserting that any additional cure or other amounts are due with respect to the corresponding Assigned Contract in connection with the assumption and assignment of such Assigned Contract, (ii) be forever barred from asserting or claiming that,

except for the payment of the Cure Cost, any conditions to assumption and assignment must be satisfied in respect of the assumption and assignment of such Assigned Contract; and (iii) be deemed to have consented to the assumption and assignment of such Assigned Contract and shall be forever barred from asserting that the Assigned Contract cannot be assumed and assigned.

20.     In the event that any objection to such assumption and assignment or the Cure Cost is timely filed, the Sellers respectfully submit that such objection must set forth (i) the basis for the objection and, if applicable, (ii) the amount that the objecting party asserts as the Cure Cost (with appropriate documentation in support thereof). After receipt of the objection, the Sellers will attempt to reconcile any difference in the Cure Cost believed to exist by the counterparty. In the event that the Sellers and the counterparty cannot resolve their Cure Cost dispute by two business days prior to the closing of the sale, upon such closing the Sellers will segregate, or arrange for the Purchaser to place into escrow, cash in the amount equal to the aggregate amount of all disputed Cure Costs. Such funds will then be available for distribution upon the resolution of any such disputes by the Court or mutual agreement of the parties.

### Jurisdiction

21.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The predicates for the relief requested herein are sections 105(a), 363, 503, 1107 and 1108 under the Bankruptcy Code, Rules 2002, 6004, 6006, 7004, 9006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

22.     By this Procedures Motion, the Debtors seek the entry of Proposed

Procedures Order in substantially the form attached hereto as Exhibit B:  (i) establishing the

Bidding Procedures; (ii) authorizing and scheduling the Auction; (iii) approving those provisions

of the Stalking Horse Purchase Agreement providing for payment of the Break-up Fee and the

Expense Reimbursement to the Stalking Horse Bidder; (iv) approving the procedure for

determining the Cure Costs; (v) approving the form and manner of service of the Notice of

Auction and Sale Hearing, and the Cure Costs Notice; and (vi) scheduling the Sale Hearing.

## Basis For Relief

### A.     The Bidding Procedures Should Be Approved

23.     The Sellers submit that good cause exists to approve the Bidding

Procedures, as described in the Stalking Horse Purchase Agreement and the Proposed Procedures

Order.  The Sellers believe that the Bidding Procedures are fair, reasonable and appropriate, and

in the best interests of the Sellers, their estates, their creditors and other parties in interest, as the

Bidding Procedures will, among other things, retain for the benefit of the Sellers' estates the

prospect of a successful sale to the Stalking Horse Bidder while enabling the Sellers to solicit

higher or better bids.

### B.     The Break-Up Fee and the Expense Reimbursement Should Be Approved

24.     The Sellers submit that good cause exists to approve the Break-up Fee and

the Expense Reimbursement.  Stalking horse protections such as the Break-up Fee and the

Expense Reimbursement encourage a potential purchaser to invest the requisite time, money and

effort to negotiate with a debtor and perform the necessary due diligence attendant to the

acquisition of the debtor's assets, despite the inherent risks and uncertainties of the chapter 11

process.  Approval of break-up fees in connection with the sale of assets pursuant to section 363

of the Bankruptcy Code has become an established practice in chapter 11 cases.  Courts have

approved bidding incentives similar to the Break-up Fee and the Expense Reimbursement where

the incentives are beneficial to the estate because they induce an initial bid, promote competitive

bidding, provide a minimum floor bid on which other bidders and the Sellers can rely and

compensate the purchaser for its time, effort, expense and risk.  *See Calpine Corp. v O'Brien*

*Envtl. Energy, Inc.*, 181 F.3d 527, 535-537 (3d Cir. 1999) (detailing situations where a breakup

fee is entitled to administrative expense status under Bankruptcy Code section 503(b)(1)(A)

because the fees provided a benefit to the estate); *In re Women First Healthcare, Inc.*, 332 B.R.

115, 122 (Bankr. D. Del. 2005) (noting the break-up fee and other bid procedures provided a

benefit to the estate by encouraging a quick consummation of the deal); *In re Homelife Corp.*,

2002 WL 31115654 (D. Del. Sep. 20, 2002) (following *O'Brien*).

        25.     The Break-up Fee proposed pursuant to the Stalking Horse Purchase

Agreement is reasonable in light of the Stalking Horse Bidder's efforts and the Estimated

Purchase Price.  In the present case, the Break-up Fee payable to the Stalking Horse Bidder is

approximately 3.6% of the Estimated Adjusted Purchase Price.  The Break-up Fee, in terms of its

percentage and amount, is of the same order of magnitude as break-up fees approved in other

cases.  *See, e.g., In re Global Home Products LLC, et al.*, Case No. 06-10340 (KG) (Bankr. D.

Del. July 14, 2006) (order approving a break-up fee of $650,000 or 3.1% of purchase price of

$21 million); *In re Women First Healthcare*, 332 B.R. at 118 (approving a break-up fee of

$50,000 or 2.8% on the sale of assets worth $1.75 million); *In re Decora Indus., Inc.*, 2002 WL

32332749 (D. Del. May 20, 2002) (Farnan, J.) (approving on appeal break-up fee of $625,000 or

3% of purchase price); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (PJW) (Bankr. D. Del.

Dec. 11, 2001) (approving a $25 million, or 3% of purchase price, break-up fee); *In re Caldor,

Inc. – NY*, Case No. 95-B-44080 (JLG) (Bankr. S.D.N.Y. Feb. 4, 1999) (order approving break-

up fees of $1,900,000 on purchase price of $75,735,000 and $3,550,000 on purchase price of

$142,000,000 or approximately 2.5%).

26.    The Break-up Fee and the Expense Reimbursement already have benefited

the Sellers' estates. The Break-up Fee and the Expense Reimbursement have encouraged

competitive bidding by inducing a bid that otherwise would not have been made, in that the

Stalking Horse Bidder would not have entered into the Stalking Horse Purchase Agreement

without the Break-up Fee and the Expense Reimbursement. In addition, the mere existence of

the Break-up Fee and the Expense Reimbursement permit the Sellers to insist that competing

bids for the Purchased Assets be materially higher or otherwise better than the offer set forth in

the Stalking Horse Purchase Agreement, a clear benefit to the Sellers' estates.

27.    Each of the Break-up Fee and the Expense Reimbursement is a material

inducement for, and condition of, the Stalking Horse Bidder's entering into the Stalking Horse

Purchase Agreement. The Stalking Horse Bidder is unwilling to commit to hold open its offer to

purchase the Purchased Assets under the terms of the Stalking Horse Purchase Agreement unless

it is assured of payment of the Break-up Fee and the Expense Reimbursement in accordance with

the terms of the Stalking Horse Purchase Agreement. Thus, absent entry of the Break-up Fee

and the Expense Reimbursement, the Sellers may lose the opportunity to obtain what they believe to be the highest and best available offer for the Purchased Assets.

28.     The Sellers believe that each of the Break-up Fee and the Expense Reimbursement is reasonable, given the benefits to the Sellers' estates of having a definitive agreement to sell the Purchased Assets and the risk to the Stalking Horse Bidder that a third party offer ultimately may be accepted.  Moreover, the Sellers' ability to offer the Break-up Fee and the Expense Reimbursement enables them to ensure the sale of the Purchased Assets to a contractually committed bidder at a price they believe to be fair while, at the same time, providing the Sellers with the potential of even greater benefit to the estates.

### Notice of Motion

29.     Notice of this Procedures Motion has been provided to the following parties or, in lieu thereof, to their counsel, if known:  (i) the U.S. Trustee; (ii) the agents under the Debtors' proposed postpetition secured debtor in possession credit facility; (iii) the agents under the Secured Credit Facility; (iv) the Canadian Monitor; (v) the Purported Ad Hoc Bondholders Committee; (vi) the indenture trustees for the Notes; (vii) for the Stalking Horse Bidder; (viii) creditors holding the thirty largest unsecured claims against the Debtors on a consolidated basis as identified in the Debtors' petitions and (ix) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

30.     The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully seek the entry of the Proposed Bidding Procedure Order, in substantially the form attached hereto as Exhibit B:  (i) establishing the Bidding Procedures; (ii) authorizing and scheduling the Auction; (iii) approving those provisions of the Stalking Horse Purchase Agreement providing for payment of the Break-up Fee and the Expense Reimbursement to the Stalking Horse Bidder; (iv) approving the procedure for determining Cure Costs; (v) approving the form and manner of service of the Notice of Auction and Sale Hearing, and the Cure Costs Notice; (vi) scheduling the Sale Hearing; and (vii) granting

such other and further relief as is just and proper.

DATED: NOVEMBER 1̂7, 2007

SHEARMAN & STERLING LLP
Fredric Sosnick
Douglas P. Bartner
Susan A. Fennessey
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Email: fsosnick@shearman.com
        dbartner@shearman.com
        sfennessey@shearman.com

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        joneill@pszjlaw.com
        tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and
Debtors in Possession

## EXHIBIT A

**Stalking Horse Purchase Agreement**

———————————————

ASSET PURCHASE AGREEMENT

———————————

among

POPE & TALBOT, INC.,

POPE & TALBOT LTD.,

POPE & TALBOT LUMBER SALES, INC.,

POPE & TALBOT SPEARFISH LIMITED PARTNERSHIP

and

INTERNATIONAL FOREST PRODUCTS LIMITED

Dated as of November 19, 2007

Execution Copy

TABLE OF CONTENTS

Page

RECITALS

ARTICLE I

DEFINITIONS

SECTION 1.01    Definitions................................................................. 1
SECTION 1.02    Interpretation and Rules of Construction................................ 16

ARTICLE II

PURCHASE AND SALE

SECTION 2.01    Purchase and Sale of Assets............................................ 16
SECTION 2.02    Assumption and Exclusion of Liabilities................................ 19
SECTION 2.03    Purchase Price......................................................... 20
SECTION 2.04    Payment of the Purchase Price.......................................... 20
SECTION 2.05    Allocation of the Purchase Price....................................... 20
SECTION 2.06    Purchaser's Deposit.................................................... 21
SECTION 2.07    Interim Price Adjustment............................................... 21
SECTION 2.08    Actual Price Adjustment................................................ 21
SECTION 2.09    Cure Costs............................................................. 23
SECTION 2.10    Forestry Services Payments............................................. 23
SECTION 2.11    Closing................................................................ 24
SECTION 2.12    Closing Deliveries by the Sellers...................................... 24
SECTION 2.13    Closing Deliveries by the Purchaser.................................... 25
SECTION 2.14    Registration of Transfers of Real Property............................. 26
SECTION 2.15    Post-Closing Notification.............................................. 28
SECTION 2.16    Landfill Price Adjustment.............................................. 28
SECTION 2.17    Wind-Up Deficiency..................................................... 28

ARTICLE III

REPRESENTATIONS AND WARRANTIES
OF THE SELLERS

SECTION 3.01    Organization, Authority and Qualification of the Sellers............... 29
SECTION 3.02    No Conflict............................................................ 29
SECTION 3.03    Governmental Consents and Approvals.................................... 30
SECTION 3.04    SEC Filings; Financial Statements; Undisclosed Liabilities............. 30
SECTION 3.05    Litigation............................................................. 31
SECTION 3.06    Compliance with Laws................................................... 31
SECTION 3.07    Sufficiency of Purchased Assets........................................ 31
SECTION 3.08    Real Property Interests................................................ 31

SECTION 3.09    Tangible Personal Property. ................................................................. 32
SECTION 3.10    Intellectual Property. ......................................................................... 32
SECTION 3.11    Permits and Licenses. ......................................................................... 32
SECTION 3.12    Timber Tenures. .................................................................................. 32
SECTION 3.13    Employee Benefit Matters. .................................................................. 33
SECTION 3.14    Collective Bargaining Agreements and Certifications. ........................... 33
SECTION 3.15    Employee Controversies. ...................................................................... 34
SECTION 3.16    Taxes. ................................................................................................. 34
SECTION 3.17    Material Contracts. .............................................................................. 34
SECTION 3.18    Environmental Matters. ....................................................................... 35
SECTION 3.19    Brokers. ............................................................................................... 35
SECTION 3.20    Disclaimer of the Sellers. ..................................................................... 36
SECTION 3.21    Residency and Structure ....................................................................... 36

ARTICLE IV

REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER

SECTION 4.01    Organization and Authority of the Purchaser. ....................................... 37
SECTION 4.02    No Conflict. .......................................................................................... 37
SECTION 4.03    Governmental Consents and Approvals. ................................................. 37
SECTION 4.04    Financing. ............................................................................................. 38
SECTION 4.05    Litigation. ............................................................................................. 38
SECTION 4.06    Brokers. ................................................................................................ 38
SECTION 4.07    Independent Investigation; Sellers' Representations. .............................. 38
SECTION 4.08    Investment Canada. ............................................................................... 39
SECTION 4.09    GST and PST Registration Numbers. ..................................................... 39

ARTICLE V

ADDITIONAL AGREEMENTS

SECTION 5.01    Bankruptcy Court and Canadian Court Approvals. .................................. 39
SECTION 5.02    Break-up Fee. ........................................................................................ 39
SECTION 5.03    Expense Reimbursement. ....................................................................... 39
SECTION 5.04    Assumption of Assigned Contracts; Shared Contracts. ........................... 40
SECTION 5.05    Conduct of Business Prior to the Closing. .............................................. 41
SECTION 5.06    Access to Information. ........................................................................... 42
SECTION 5.07    Damage or Destruction. ......................................................................... 43
SECTION 5.08    Confidentiality. ..................................................................................... 43
SECTION 5.09    Regulatory and Other Authorizations; Notices and Consents. ................. 44
SECTION 5.10    Permits and Licenses. ............................................................................ 45
SECTION 5.11    Retained Names and Marks. ................................................................... 46
SECTION 5.12    Bulk Transfer Laws. .............................................................................. 47
SECTION 5.13    Transition Services. ............................................................................... 47
SECTION 5.14    Further Action. ...................................................................................... 47

SECTION 5.15    Tax Cooperation and Exchange of Information.........................................47
SECTION 5.16    Conveyance Taxes ....................................................................................48
SECTION 5.17    Proration of Taxes and Certain Charges. ..................................................49
SECTION 5.18    Personal Information..................................................................................49
SECTION 5.19    Waiver of Site Profile. ..............................................................................50
SECTION 5.20    Vehicle Registration..................................................................................50
SECTION 5.21    Delivery of Audited Financial Statements etc. .........................................50
SECTION 5.22    Other Contracts with USDA. .....................................................................51
SECTION 5.23    Removal of Private Lands from TFL 23....................................................51

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01    Salaried Employees....................................................................................52
SECTION 6.02    Union Employees .......................................................................................53
SECTION 6.03    Co-Operation..............................................................................................53
SECTION 6.04    Employee Plans..........................................................................................53
SECTION 6.05    WARN Act. .................................................................................................54
SECTION 6.06    Employee Benefits Claims.........................................................................54
SECTION 6.07    COBRA Obligations. .................................................................................54
SECTION 6.08    Payment and Expenses at Closing. ............................................................54
SECTION 6.09    Vacation Accruals. .....................................................................................55

## ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.01    Conditions to Obligations of the Sellers. ..................................................55
SECTION 7.02    Conditions to Obligations of the Purchaser ..............................................56

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01    Termination.................................................................................................57
SECTION 8.02    Effect of Termination.................................................................................58

## ARTICLE IX

## NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES

SECTION 9.01    Non-Survival of Representations and Warranties.......................................58

## ARTICLE X

### GENERAL PROVISIONS

SECTION 10.01  Expenses. ........................................................................................ 58
SECTION 10.02  Notices. ........................................................................................... 59
SECTION 10.03  Public Announcements. ................................................................ 60
SECTION 10.04  Severability. .................................................................................. 60
SECTION 10.05  Entire Agreement. ........................................................................ 60
SECTION 10.06  Assignment. ................................................................................. 60
SECTION 10.07  Amendment. ................................................................................. 61
SECTION 10.08  Waiver. .......................................................................................... 61
SECTION 10.09  No Third Party Beneficiaries. ..................................................... 61
SECTION 10.10  Currency. ...................................................................................... 61
SECTION 10.11  Governing Law. ........................................................................... 61
SECTION 10.12  Waiver of Jury Trial. .................................................................... 61
SECTION 10.13  Counterparts. ................................................................................ 62

EXHIBITS

| | |
|---|---|
| 1.01(a) | Form of Omnibus Assignment of Lease |
| 1.01(b) | Form of Assignment of Transferred Intellectual Property |
| 1.01(c) | Form of Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities |
| 1.01(d) | Form of Deed and Land Transfer and Forms of Warranty Deeds (U.S.) |
| 1.01(e) | Sellers' Knowledge |
| 1.01(f) | Principles and Procedures for Inventory Valuation |
| 1.01(g) | Formula for Determining Target Inventory Adjustment |
| 1.01(h) | Castlegar Landfill Site |
| 1.01(i) | Formula for Determining STI Adjustment |
| 2.04 | Form of Deposit Escrow Agreement |
| 2.07(b) | Form of Price Adjustment Escrow Agreement |
| 2.09(a) | Form of Asserted Cure Costs Escrow Agreement |
| 2.10 | Principles and Procedures for Determining Forestry Services |
| 3.12 | Timber Tenures |
| 5.01 | Bidding Procedures |
| 5.05 | Mill Log Inventories |
| 5.13 | Key Terms of Transition Services Agreement |
| 6.01 | Salaried Employees |

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 19, 2007, among **Pope & Talbot, Inc.** ("PTI"), a corporation organized under the laws of the State of Delaware, **Pope & Talbot Ltd.** ("PTL"), a corporation organized under the federal laws of Canada, **Pope & Talbot Lumber Sales, Inc.** ("PTLS"), a corporation organized under the laws of the State of Delaware, **Pope & Talbot Spearfish Limited Partnership** ("PTSLP"), a limited partnership under the laws of the State of South Dakota (collectively, the "Sellers"), and **International Forest Products Limited** (the "Purchaser"), a British Columbia corporation.

RECITALS

WHEREAS, the Sellers are collectively engaged in the business of timber forestry operations and the manufacture at the Mills and sale of dimension lumber and boards, wood pellets, sawdust, chips and other related products (the "Business");

WHEREAS, the Sellers and certain of their Affiliates anticipate commencing voluntary cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to chapter 11 of title 11, United States Code (the "Bankruptcy Code"), and certain of the Sellers have commenced proceedings (the "Canadian Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to the *Companies' Creditors Arrangement Act* (Canada) (the "CCAA") and the Initial Order of the Honourable Mr. Justice Morawetz dated October 29, 2007; and

WHEREAS, the Sellers wish to sell, assign and transfer to the Purchaser, and the Purchaser wishes to purchase and acquire from the Sellers, the Purchased Assets and, in connection therewith, the Purchaser is willing to assume the Assumed Liabilities and assume and agree to perform the Forestry Services, all upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Sellers and the Purchaser hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01        Definitions.For purposes of this Agreement:

"Action" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"Active Salaried Employees" has the meaning given to it in Section 6.01(a)

"Actual Price Adjustment" means an amount equal to:

(i)        the value of the Raw Materials, Finished Goods and Residuals Inventories on hand as of the Effective Time (as determined pursuant to Section 2.08(a)), valued in accordance with the methodology set out in Exhibit 1.01(f), less $3 million; minus

(ii)     the amount of any Target Inventory Adjustment; plus

(iii)    amounts paid as deposits by any Seller under Cutting Contracts, to the extent unapplied thereunder as of the Effective Time, net of any accrued obligations of the Sellers thereunder up to the Effective Time; plus

(iv)    outstanding deposits as of the Effective Time (A) on all Assigned Contracts other than Cutting Contracts, or (B) that relate to any of the Purchased Assets; plus or minus as may be applicable

(v)     the net amount of any prorations pursuant to Section 5.17; plus or minus as may be applicable

(vi)    the amount of any STI Adjustment.

"Affected Assets" has the meaning given to it in Section 5.07(a)(i).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" has the meaning given to it in the Preamble.

"Allocation" has the meaning given to it in Section 2.05.

"Ancillary Agreements" means the Bill of Sale, the Deeds, the Omnibus Assignment of Lease, the Assignment of Transferred Intellectual Property, the Transition Services Agreement, the Deposit Escrow Agreement, the Price Adjustment Escrow Agreement, the Asserted Cure Costs Escrow Agreement, and such other documents or instruments of transfer and conveyance as may reasonably be requested by the Purchaser, each in form and substance reasonably acceptable to the Purchaser and the Sellers, the terms of which shall be fully consistent with this Agreement.

"Asserted Cure Costs" means, in the aggregate, all Cure Costs asserted by any counterparty to an Assigned Contract that, as of two (2) Business Days prior to the Closing Date, are not Determined Cure Costs.

"Asserted Cure Costs Deposit" has the meaning given to it Section 2.09(a).

"Asserted Cure Costs Escrow Agreement" has the meaning given to it Section 2.09(a).

"Assigned Contract" means any Material Contract that (a) is not a Shared Contract, (b) does not become an Excluded Contract pursuant to Section 5.04(a), or (c) that is not deemed an Excluded Asset by operation of Section 2.01(b)(xiv).

"Assigned Permit and License" means any Permit and License that does not become an Excluded Contract pursuant to Section 5.04(a).

"Assignment of Transferred Intellectual Property" means the Assignment of Transferred Intellectual Property to be executed by the Seller at the Closing, substantially in the form of Exhibit 1.01(b).

"Assumed Liabilities" has the meaning given to it in Section 2.02(a).

"Auction" means an auction to be conducted by Sellers pursuant to the Bidding Procedures Orders.

"Bankruptcy Code" has the meaning given to it in the Recitals.

"Bankruptcy Court" has the meaning given to it in the Recitals.

"Bid" has the meaning given to it in Exhibit 5.01.

"Bidding Procedures" has the meaning given to it in Exhibit 5.01.

"Bidding Procedures Orders" has the meaning given to it in Section 5.01(a).

"Bill of Sale" means the Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities to be executed by the Sellers at the Closing, substantially in the form of Exhibit 1.01(c).

"Break-up Fee" has the meaning given to it in Section 5.02.

"Business" has the meaning given to it in the Recitals.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York.

"Canadian Court" has the meaning given to it in the Recitals.

"Canadian GAAP" means Canadian generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Canadian Proceedings" has the meaning given to it in the Recitals.

"Canadian Transaction Approval and Vesting Order" has the meaning given to it in Section 2.14(a).

"CCAA" has the meaning given to it in the Recitals.

"Castlegar Landfill Site" means the lands used by the Sellers as a landfill in connection with the operation of Sellers' sawmill in Castlegar, British Columbia, Canada, as more particularly described on the attached Exhibit 1.01(h).

"Chapter 11 Cases" has the meaning given to it in the Recitals.

"Closing" has the meaning given to it in Section 2.11.

"CMSG Plan" has the meaning given to it in Section 2.17(a).

"Closing Date" has the meaning given to it in Section 2.11.

"Closing Date Mercer Report" has the meaning given to it in Section 2.17(b).

"Closing Date Wind-Up Deficiency" has the meaning given to it in Section 2.17(b), but in no event shall be greater than Cdn $1,582,000.

"Collective Agreement" means any of the Collective Agreements listed in Section 3.14 of the Disclosure Schedule.

"Competition Act" means the *Competition Act* (Canada).

"Confidentiality Agreement" has the meaning given to it in Section 5.08(a).

"Contracts" means any arrangement, note, bond, commitment, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer or gains and similar Taxes, including PST and GST.

"Cure Costs" has the meaning given to it in Section 5.04(c).

"Cutting Contracts" means any of the Contracts pursuant to which the Sellers have the right to harvest timber from property owned by another Person, including any Governmental Authority, regardless of whether such Contract includes a conveyance of stumpage to the Sellers, but excluding the Timber Tenures.

"Deed" means, with respect to each parcel of Owned Real Property located in the United States of America, the transfer or other instrument of conveyance customary to the applicable jurisdiction (but in no case will the applicable conveyance document provide greater assurances than the original conveyance document received by the applicable Seller) to be executed by the applicable Seller at the Closing in order to convey to the Purchaser such Seller's interest, if any, in such parcel of Owned Real Property, free and clear of all liens and encumbrances, other than Permitted Encumbrances.

"Deposit Escrow Agreement" means the Deposit Escrow Agreement to be entered into among the Sellers, Purchaser and Escrow Agent, attached hereto as Exhibit 2.04.

"Determined Cure Costs" means, in the aggregate, all Cure Costs that have been determined pursuant to a Final Order or pursuant to an agreement between one or more of the Sellers and the counterparty to the applicable Assigned Contract.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof delivered by the Sellers to the Purchaser in connection with this Agreement. Notwithstanding anything to the contrary contained in the Disclosure Schedule or in this Agreement, the information and disclosures contained in any section of the Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Schedule as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure.

"Effective Time" means the first instance in time (Pacific Time) on the Closing Date.

"Employees" means Salaried Employees and Union Employees.

"Employee Plans" has the meaning given to it in Section 3.13(a).

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment, in each case in effect as of the date hereof, relating to pollution or protection of the environment.

"Environmental Liability" means any claim, demand, order, suit, obligation, liability, cost (including the cost of any investigation, testing, compliance or remedial action), consequential damages, loss or expense (including reasonable and incurred attorney's and consultant's fees and expenses) arising out of, relating to or resulting from any Environmental Law or environmental, health or safety matter or condition, including natural resources, and related in any way to the Purchased Assets or to this Agreement or its subject matter, in each case whether arising or incurred before, at or after the Closing, including any and all Liabilities (whether arising under Environmental Laws in effect at Closing or thereafter, Environmental Permits, common law, Contracts or otherwise in any manner whatsoever, whether known or unknown on the Closing Date) arising out of, relating to or resulting from:

(i)     the presence in, on, at or under, or the Release to, at or from any of the Owned Real Property, any of the Leased Real Property or any area used pursuant to the Permits and Licences (including the Timber Tenures), including all soil, sediments, water, groundwater, buildings, structures, fixtures, improvements and equipment thereon or thereunder and Releases therefrom into the air, of any Hazardous Materials, whether before or after the Closing;

(ii)    the presence of any Hazardous Materials in, on, at or under any land, sediments, water, groundwater or any other location whatsoever where such Hazardous Materials originated whether before or after the Closing from any of the Owned Real

Property, any of the Leased Real Property or any area used pursuant to the Permits and Licences (including the Timber Tenures), including all soil, sediments, water, groundwater, buildings, structures, fixtures, improvements and equipment thereon or thereunder; and

(iii)   any other circumstance, condition, matter, occurrence, issue, event or requirement relating to the environment (which includes any building, structure, fixture, improvement or equipment on or forming part of any of the Purchased Assets), health or safety that exists in, on, at or under any of the Owned Real Property, any of the Leased Real Property or any area used pursuant to the Permits and Licences (including the Timber Tenures), including all soil, sediments, water, groundwater, buildings, structures, fixtures, improvements and equipment thereon or thereunder that is or was caused (directly or indirectly) by, or arises from or relates to, the operation of the Business or the Purchased Assets, whether before or after the Closing.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law or otherwise required by any applicable Governmental Authority.

"ERISA" has the meaning given to it in Section 3.13(a).

"Escrow Agent" has the meaning given to it in the Deposit Escrow Agreement.

"Excluded Assets" has the meaning given to it in Section 2.01(b).

"Excluded Business" means any business conducted by the Sellers other than the Business, including, for certainty, (a) the ownership and operation of the sawmill at Fort St. James, British Columbia, Canada and all related timber forestry and other operations and the manufacture and sale of dimension lumber and boards, wood pellets, sawdust, chips and other related products therefrom, (b) the manufacture and sale of kraft pulp and related products, (c) the ownership of a former sawmill situated at or about at Midway, British Columbia, Canada, and (d) each of the former mill, wood treatment and landfill sites situated at or about Port Gamble, Washington, St. Helens, Oregon and Oakridge, Oregon, USA.

"Excluded Contract" has the meaning given to it in Section 5.04(a).

"Excluded Taxes" means all Taxes relating to the Purchased Assets or the Business for any Pre-Closing Period. For purposes of this Agreement, in the case of any Straddle Period, (a) Property Taxes relating to the Purchased Assets allocable to the Pre-Closing Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that fall within the Pre-Closing Period and the denominator of which is the number of days in the entire Straddle Period, and (b) Taxes (other than Property Taxes) relating to the Purchased Assets for the Pre-Closing Period shall be computed as if such taxable period ended as of the close of business on the Closing Date.

"Existing Stock" has the meaning given to it in Section 5.11(b).

Execution Copy

"Expense Reimbursement" has the meaning set forth in Section 5.03.

"Final Order" means an order of the Bankruptcy Court or the Canadian Court which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

"Financial Advisor" means Rothschild Inc.

"Forestry Services" means all silviculture, reforestation, road deactivation and road reclamation Liabilities and other post-harvest obligations associated with the Timber Tenures that relate to attaining the applicable reforestation or road deactivation standards for any harvested tracts or roads, including conducting surveys of harvested blocks, re-surveying blocks that meet conditionally satisfactory reforested levels, deactivation and site reclamation of road rights of way and re-treating harvested blocks that had been deemed not to meet the reforestation standards, all as determined using the principles and procedures set out in Exhibit 2.10.

"Forestry Services Amount" has the meaning given to it in Section 2.10(a).

"Forestry Services Statement" has the meaning given to it in Section 2.10(a).

"GFRC" means the Grand Forks Railway Company.

"GFRC Assets" has the meaning given to it in Section 2.01(a)(x).

"GFRC Operating Agreement" means that certain operating agreement for GFRC dated March 5, 1996 and made between PTL and Welco Management Limited Partnership.

"Governmental Authority" means any federal, national, supranational, state, provincial, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"GST" means goods and services taxes payable under Part IX of the *Excise Tax Act* (Canada) and any reference to a specific provision of Part IX of the *Excise Tax Act* (Canada) shall include any successor to that provision having the same or similar effect.

"Hazardous Material" means (a) any petroleum, petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials or polychlorinated biphenyls or (b) any other chemical, material or substance defined or regulated as toxic or hazardous or as a pollutant, contaminant or waste under any Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"<u>ICA</u>" means the *Investment Canada Act* (Canada).

"<u>Inactive Employees</u>" means employees of the Sellers who are, at the Closing, on an authorized leave of absence or temporary leave of absence, including absence for workers' compensation leave, short term or long term disability, military leave, and parental or maternity leave.

"<u>Inactive Salaried Employees</u>" has the meaning given to it in Section 6.01(c).

"<u>Independent Accounting Firm</u>" means Deloitte & Touche LLP of Vancouver, British Columbia, or, if it is no longer independent of Purchaser and Sellers or it is unwilling or unable to act, such other qualified independent firm of chartered accountants as may be jointly selected by the Sellers and the Purchaser, acting reasonably, or, if they are unable to so jointly select such a firm, as may be appointed by the Bankruptcy Court.

"<u>Intellectual Property</u>" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and Internet domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing.

"<u>Interim Price Adjustment</u>" means the amount of the Actual Price Adjustment, determined as provided in Section 2.08, as if the Closing occurred at the first instance in time (Pacific time) on the last day of the month immediately preceding the Closing Date; *provided, however,* that if the Closing Date occurs within the first fifteen (15) days of a month, then such determination shall made at the end of the previous month.

"<u>Interim Forestry Services Payment</u>" has the meaning provided in Section 2.10(b).

"<u>Inventories</u>" means all (a) Raw Materials, Finished Goods and Residuals Inventories, and (b) inventories of fuel, lubricants, spare parts and shipping and other materials and supplies, in each case, primarily related to the Business and maintained, held or stored by or for any of the Sellers in connection with the Business, as of the Closing Date, and any prepaid deposits for any of the same.

"<u>IRS</u>" means the Internal Revenue Service of the United States.

"<u>KPMG</u>" means KPMG LLP.

"<u>Land Title Office</u>" means the Kamloops Land Title Office, Kamloops, British Columbia.

"<u>Landfill Price Adjustment</u>" has the meaning given to it in Section 2.16.

"<u>Law</u>" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means the real property listed on Section 2.01(a)(i)(B) of the Disclosure Schedule, together with, to the extent leased by such Seller primarily in connection with the operations of the Business, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems and items of personal property of such Seller used primarily in the Business attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"LFPLLP" means Lignum Forest Products LLP.

"Liabilities" means any and all debts, liabilities obligations to perform services and other obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking.

"Liens" means any mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, charge, hypothecation, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code, *Personal Property Security Act* (British Columbia) or any comparable Law.

"Loss" has the meaning given to it in Section 5.07(a).

"Material Adverse Effect" means any circumstance, change in or effect on the Business that is materially adverse to the results of operations or the financial condition of the Business, taken as a whole; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has been a "Material Adverse Effect": (a) events, circumstances, changes or effects that generally, or in the regions in which the Business operates, affect the industries in which the Business operates (including legal and regulatory changes); (b) general economic or political conditions or events, circumstances, changes or effects affecting the financial or securities markets generally; (c) events, circumstances, changes or effects relating to foreign currency exchange rate fluctuations; (d) changes arising from the consummation of the Transactions, or the announcement of the execution of this Agreement, including (i) any actions of competitors, (ii) any actions taken by or losses of Employees or (iii) any delays or cancellations of orders for products or services; (e) any reduction in the price of services or products offered by the Business in response to the reduction in price of comparable services or products offered by a competitor; (f) any circumstance, change or effect that results from any action taken pursuant to or in accordance with this Agreement or at the request of the Purchaser; (g) any action taken by any of the Sellers or any of their Affiliates within the Chapter 11 Cases, or by any of the Sellers, any of their Affiliates, or any court-appointed officer within the Canadian Proceedings in respect of the assets and business not included in the Business, and any event, circumstance, change or effect arising by reason only of the mere filing of the Chapter 11 Cases or commencement of the Canadian Proceedings; and (h) changes caused by acts of war, armed hostilities or terrorism or any escalation or

worsening of current conditions caused by such acts of war, armed hostilities or terrorism (whether or not declared) occurring after the date hereof.

"Material Contracts" has the meaning given to it in Section 3.17(a).

"Mill" means any of the manufacturing facilities operated by a Seller on lands at or about Castlegar, British Columbia and Grand Forks, British Columbia, in Canada, and the Spearfish Mill, all of which are included among the Owned Real Property or the Leased Real Property.

"Offering Memorandum" has the meaning given to it in Section 3.20.

"Omnibus Assignment of Lease" means the Omnibus Assignment of Lease to be executed by the Sellers at the Closing with respect to all parcels of Leased Real Property, substantially in the form of Exhibit 1.01(a).

"Owned Real Property" means the real property listed on Section 2.01(a)(i)(A) of the Disclosure Schedule, and which, for clarity, includes the Castlegar Landfill Site, and all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, and items of personal property of PTL or PTSLP, as applicable, attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"P&TF" means P&T Funding Ltd., a corporation organized under the laws of British Columbia, Canada.

"Permits and Licenses" has the meaning given to it in Section 2.01(a)(viii).

"Permitted and Licensed Crown Lands" means lands owned by Her Majesty the Queen in Right of the Province of British Columbia in respect of which Sellers have Permits and Licenses.

"Permitted Encumbrances" means: (a) statutory Liens for current Taxes not yet due or delinquent (or which may be paid without interest or penalties) or the validity or amount of which is being contested in good faith by appropriate proceedings; (b) mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Sellers or the validity or amount of which is being contested in good faith by appropriate proceedings, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation); (c) zoning, landmarking, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of the Purchased Assets; (d) all covenants, conditions, restrictions, easements, rights-of-way, licenses, other Liens and other similar matters of record set forth in any state, local or municipal franchise under which the Business is conducted which do not materially interfere with the present use of the Purchased Assets; (e) standard title exceptions; (f) matters which would be disclosed by an accurate survey or inspection of the Real Property which do not materially impair the occupancy or current use of such Real Property which they encumber; and

(g) minor irregularities or imperfections in title; provided, however, that Liens which secure obligations of the Sellers for borrowed money shall not constitute Permitted Encumbrances.

"Permitted Registrations" has the meaning given to it in Section 2.14(a).

"Permitting Process" has the meaning given to it in Section 5.10(a).

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, Governmental Authority, first nation, aboriginal or native group or band, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Personal Information" means any personal information protected by any applicable Laws governing privacy matters and the protection of personal information.

"Petition Date" means the date on which the Sellers file the Chapter 11 Cases.

"Portland Premises" means the leased office premises located at 1500 S.W. First Avenue, Portland, Oregon.

"Post-Closing Period" means any taxable period (or portion thereof) beginning after the Closing Date.

"Pulp Logs" means any logs that are of the "pulp strata" or "sawlog strata" (Grade 4 - lumber reject; or RZ - firmwood reject) grades applicable in British Columbia.

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or prior to the Closing Date.

"Price Adjustment Delta" has the meaning given to it in Section 2.08(d)(i).

"Price Adjustment Deposit" has the meaning given to it in Section 2.04(b).

"Price Adjustment Escrow Agreement" has the meaning given to it in Section 2.07(b).

"Property Taxes" means real and personal ad valorem property Taxes and any other Taxes imposed on a periodic basis and measured by the value of any item of property.

"PST" means the social services tax under the *Social Services Tax Act* (British Columbia).

"PTI" has the meaning given to it in the Preamble.

"PTL" has the meaning given to it in the Preamble.

"PTLS" has the meaning given to it in the Preamble.

"PTSLP" has the meaning given to it in the Preamble.

"Purchase Price" has the meaning given to it in Section 2.03.

"Purchase Price Bank Account" means a bank account in the United States to be designated by PTI in a written notice to the Purchaser at least five Business Days before the Closing.

"Purchased Assets" has the meaning given to it in Section 2.01(a).

"Purchaser" has the meaning given to it in the Preamble.

"Purchaser's Accountants" means KPMG, independent accountants of the Purchaser.

"Purchaser's Solicitors" means Koffman Kalef LLP, Vancouver, British Columbia.

"Purchaser's Bid" has the meaning given to it in the Bidding Procedures.

"Purchaser's Deposit" has the meaning given to it in Section 2.06.

"Qualified Overbid" means a Bid that conforms to the requirements of a Qualified Overbid in Exhibit 5.01.

"Qualifying Bidder" has the meaning given to it in the Bidding Procedures.

"Raw Materials, Finished Goods and Residuals Inventories" means the inventories of logs (excluding Pulp Logs), lumber, chips, pellets, other wood products and work-in-process and residual by-products.

"Real Property Leases" means the leases of the Leased Real Property.

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers, arising from the conduct of the Business before the Closing, whether or not in the ordinary course, together with any unpaid financing charges accrued thereon.

"Registered" means, solely with respect to Intellectual Property, issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Release" has the meaning prescribed in any applicable Environmental Law, and includes any release, spill, leak, pumping, pouring, emission, emptying, discharge, injection,

escape, leaching, disposal, dumping, deposit, spraying, burial, abandonment, incineration, seepage and placement.

"Reload Facility" means any of the three (3) facilities used for the storage and/or unloading and reloading of lumber and/or wood products from transport trucks to rail cars for transport to another location, and located at: Whitewood, South Dakota; Newcastle, Wyoming; or Spokane, Washington.

"Representatives" means, with respect to a particular Person, any director or officer or other designated representative of such Person, including such Person's attorneys and financial advisors.

"Retained Names and Marks" has the meaning given to it in Section 5.11(a).

"Salaried Employees" means employees of a Seller who are not Union Employees and who provide services primarily related to the Business, including hourly-paid employees of the Spearfish Mill, including any such employees who are Inactive Employees.

"SEC Reports" has the meaning given to it in Section 3.04(a).

"Secured Lenders" means those persons defined as "Lenders" under that certain Credit Agreement dated as of June 28, 2006 (as amended by the First Amendment thereto dated as of September 26, 2006, the Second Amendment thereto dated as of December 31, 2006 and the Third Amendment thereto dated as of May 16, 2007) among PTI, PTL, Wells Fargo Financial Corporation Canada, Ableco Finance LLC and the several lenders and other financial institutions and other entities as from time to time are parties to such Credit Agreement.

"Securities Act" has the meaning given to it in Section 3.04(a).

"Sellers" has the meaning given to it in the Preamble.

"Sellers' Accountants" means KPMG, independent accountants of the Sellers.

"Sellers' Canadian Solicitors" means Borden Ladner Gervais LLP, Vancouver, British Columbia.

"Sellers' Knowledge", "Knowledge of the Sellers" or similar terms used in this Agreement mean the actual (but not constructive or imputed) knowledge of the Persons listed in Exhibit 1.01(e) as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) without any implication of verification or investigation concerning such knowledge.

"Sellers' Solicitors" means Shearman & Sterling LLP, New York, New York.

"Shared Contract" has the meaning given to it in Section 5.04(f).

"Silviculture Expert" means a registered professional forester as may be jointly selected by the Sellers and the Purchaser, acting reasonably, or, if they are unable to so jointly select such a professional forester, as may be appointed by the Bankruptcy Court.

"Spearfish Mill" means the manufacturing facilities operated by PTSLP situated at or about Spearfish, South Dakota.

"STI Adjustment" means the adjustment amount calculated by application of the formula set out in Exhibit 1.01(i).

"Straddle Period" means any taxable period beginning on or prior to and ending after the Closing Date.

"Surplus TFL 23 Lands" means the private lands currently included in TFL 23 that are Excluded Assets.

"Target Inventory Adjustment" means the aggregate of the adjustment amounts calculated by application of the formula set out in Exhibit 1.01(g) to the Raw Materials, Finished Goods and Residuals Inventories as of the Effective Time (as determined pursuant to Section 2.08(a)).

"Tax" or "Taxes" means any and all taxes of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority.

"Tax Act" means the Income Tax Act (Canada), as amended through the date hereof.

"Tax Code" means the US Internal Revenue Code of 1986, as amended through the date hereof.

"Tax Documents" has the meaning given to it in Section 5.15.

"Tax Returns" means any and all returns, reports and forms (including, elections, declarations, amendments, schedules, information returns or attachments thereto) required to be filed with a Governmental Authority with respect to Taxes.

"Termination Date" has the meaning given to it in Section 5.09(b).

"TFL 23" means tree farm license number 23 issued to PTL by the Ministry of Forests.

"Timber Tenures" means the rights of the Sellers or any Affiliate to harvest timber from lands owned by the Province of British Columbia, all as more particularly set out in Exhibit 3.12.

"Title Company" has the meaning given to it in Section 2.14(b).

"Transaction Approval Orders" has the meaning given to it in Section 5.01(b).

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transferred Employees" means the Union Employees and the Salaried Employees who accept an offer of employment by the Purchaser made pursuant to Section 6.01(b), Section 6.01(c) or Section 6.02.

"Transferred Intellectual Property" means all Intellectual Property owned by any Seller that is used primarily in the Business, other than the Intellectual Property that is listed or described in Section 2.01(b)(ix) of the Disclosure Schedule.

"Transition Services Agreement" has the meaning given to it in Section 5.13.

"Union Employees" means employees of a Seller who are subject to a Collective Agreement and who ordinarily report for work at any of the Mills, including any of such employees who are Inactive Employees.

"USDA" means the United States Department of Agriculture.

"US GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"US Owned Real Property Transfer Documents" has the meaning given to it in Section 2.14(b).

"VMI/Reloads" means all Inventories that are vendor-managed inventories, which are maintained, held or stored by any of the Sellers' customers or third party warehouses on behalf of any of the Sellers.

"WARN Act" means Worker Adjustment and Retraining Notification Act of 1988.

"Welfare Benefits" has the meaning given to it in Section 6.06.

"Wind-Up Deficiency" has the meaning given to it in Section 2.17(a), but in no event shall be greater than Cdn $1,582,000.

SECTION 1.02    Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)      the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)      whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)      the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)      all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)      the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)      references to a Person are also to the Person's heirs, executors, administrators, personal representatives, successors and permitted assigns, as applicable;

(h)      references to the Sellers are also to each Seller individually; and

(i)      the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01      <u>Purchase and Sale of Assets.</u> (a) Upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase from the Sellers, the following assets (the "<u>Purchased Assets</u>"), free and clear of all Liens other than Permitted Encumbrances:

(i)      the Owned Real Property and all of the Sellers' right, title and interest in and to the Leased Real Property save and except any Leased Real Property that is leased under a lease that is an Excluded Contract;

(ii)      all tangible personal property owned by the Sellers and used primarily in the conduct of the Business, including equipment, machinery, trucks, cars, other vehicles, rolling stock and marine vessels, except those that are included in the GFRC Assets;

(iii)      the Inventories, other than VMI/Reloads;

(iv)      the books of account, general, financial, Tax (other than income tax) and personnel records, invoices, shipping records, supplier lists, correspondence and other

Execution Copy

documents, records and files and any rights thereto owned, solely associated with or solely employed by the Sellers in the conduct of the Business;

(v)      the goodwill of the Sellers to the extent relating to the Business;

(vi)     the Transferred Intellectual Property (to the extent transferable);

(vii)    all of the Sellers' right, title and interest in and to the Assigned Contracts (to the extent that such Contracts are transferable);

(viii)   all of the Sellers' right, title and interest in and to the municipal, state, provincial and federal franchises, permits, licenses, agreements, waivers and authorizations, including Environmental Permits, held or used by the Sellers solely in connection with the Business (collectively, the "Permits and Licenses"), save and except any that is an Excluded Contract or a GFRC Asset;

(ix)     the sales and promotional literature, customer lists and other sales-related materials of the Sellers related to the Business;

(x)      one common share without par value in the capital of GFRC and a beneficial one-half interest in all of the real and personal property (tangible and intangible) held by GFRC, including the property and assets (including all of the Sellers' right, title and interest in and to the GFRC Operating Agreement) listed in Section 2.01(a)(x) of the Disclosure Schedule (the "GRFC Assets"); and

(xi)     subject to the provisions of Section 2.01(b), all of the Sellers' right, title and interest in and to (A) all other real and personal property (tangible and intangible) that is used primarily in connection with the Business, (B) to the extent transferable and only to the extent related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by the Sellers on the purchase or other acquisition of the Purchased Assets, and (C) any rights, demands, claims, credits, allowances, rebates, causes of action, known or unknown, or rights of setoff, other than against Sellers or any of their Affiliates; arising out of or relating to any of the Purchased Assets.

(b)      Notwithstanding anything in Section 2.01(a) to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver, nor cause to be sold, conveyed, assigned, transferred or delivered, to the Purchaser, and the Purchaser shall not purchase, and the Purchased Assets shall not include, the Sellers' right, title and interest in and to any assets of the Sellers not expressly included in the Purchased Assets (the "Excluded Assets"), including:

(i)      the Purchase Price Bank Account;

(ii)     the Receivables;

(iii)    VMI/Reloads;

(iv)    all cash and cash equivalents, securities, and negotiable instruments of the Sellers on hand, in lock boxes, in financial institutions or elsewhere, including all cash residing in any collateral cash account securing any obligation or contingent obligation of the Sellers or any of their Affiliates;

(v)    any rights to Tax refunds, credits or similar benefits attributable to Excluded Taxes;

(vi)    LFPLLP;

(vii)    the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of the Sellers, as well as any other records or materials relating to the Sellers generally, and not involving or directly related to the Purchased Assets or the operations of the Business;

(viii)    the Retained Names and Marks;

(ix)    any right, property or asset that is listed or described in Section 2.01(b)(ix) of the Disclosure Schedule;

(x)    all rights of the Sellers under this Agreement and the Ancillary Agreements;

(xi)    Tax Returns of the Sellers, other than those relating solely to the Purchased Assets or the Business, except that income tax returns and documents and records related to such income tax returns (whether or not relating solely to the Purchased Assets or the Business) shall be Excluded Assets;

(xii)    all current and prior insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(xiii)    any rights, demands, claims, actions, including, without limitation, causes of action constituting avoidance actions or other claims of Sellers' estates under chapter 5 of the Bankruptcy Code;

(xiv)    any Excluded Contract, including Contracts with LFPLLP, and rights thereunder, and any Material Contract which the Bankruptcy Court or Canadian Court has determined shall not be assigned to the Purchaser;

(xv)    all personal property (tangible and intangible) located at the Portland Premises that is used primarily in the conduct of any Excluded Business; and

(xvi)    any assets primarily used by any of the Sellers or their Affiliates in the conduct of any Excluded Business.

SECTION 2.02          Assumption and Exclusion of Liabilities.  (a) Apart from the assumption and agreement to perform the Forestry Services as provided for in Section 2.10, the Purchaser shall assume no liability or obligation of the Sellers except the liabilities and obligations set forth in this Section 2.02 (the "Assumed Liabilities"), which the Purchaser shall assume and pay, perform and discharge in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities or obligations are owed:

(i)          all Liabilities of the Sellers under the Real Property Leases (other than any that is an Excluded Contract) and licenses, the Assigned Contracts, and the Permits and Licenses, (other than any that is an Excluded Contract) in each case arising from and after the Closing Date;

(ii)          all Liabilities of the Seller under the Permitted Encumbrances arising from and after the Closing Date;

(iii)          all real (including transfer taxes) and personal property Taxes and assessments on the Purchased Assets that relate to the period from and after the Closing Date;

(iv)          all Environmental Liabilities of the Sellers in respect of the Owned Real Property, the Leased Real Property and any area used pursuant to the Permits and Licenses (including the Timber Tenures);

(v)          all Liabilities in respect of the CMSG Plan, whether arising before or after the Closing Date;

(vi)          any and all Liabilities of the Sellers relating to GRFC, any shares in the capital of GFRC and any property or other assets held by GFRC in trust for the benefit of any of the Sellers (whether as an undivided interest with others or otherwise), including the GFRC Assets, that relate to the period from and after the Closing Date; and

(vii)          all other Liabilities arising in connection with the ownership, operation, and use of the Purchased Assets from and after the Closing Date.

(b)          Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that the Purchaser shall not assume or in any manner whatsoever be liable or responsible for any liability or obligation of the Sellers, or of any predecessor or Affiliate of the Sellers, other than the Assumed Liabilities, the Forestry Services, Cure Costs and Conveyance Taxes (in accordance with Section 5.16).

SECTION 2.03          Purchase Price.  The purchase price (the "Purchase Price") payable by the Purchaser to the Sellers for the sale, transfer, assignment, conveyance and delivery to the Purchaser of the Purchased Assets shall be equal to the sum of:  (a) $69 million; plus (b) the Actual Price Adjustment; minus (c) the Cure Costs; minus (d) the Landfill Price Adjustment; minus (e) any Wind-Up Deficiency.

SECTION 2.04        Payment of the Purchase Price. The Purchaser shall pay the Purchase Price to the Sellers as follows:

(a)        the sum of: (i) $69 million, plus (ii) an amount equal to seventy-five percent (75%) of the Interim Price Adjustment; minus (iii) the amount of the Purchaser's Deposit plus all accrued interest thereon; minus (iv) the amount of the Determined Cure Costs as of two (2) Business Days prior to the Closing Date; minus (v) the amount of the Asserted Cure Costs; minus (vi) the Landfill Price Adjustment; minus (vii) any Wind-Up Deficiency, shall be paid by completed wire transfer to the Purchase Price Bank Account of immediately available, good funds on the Closing Date;

(b)        an amount equal to twenty-five percent (25%) of the Interim Price Adjustment (the "Price Adjustment Deposit") shall be deposited with the Escrow Agent on the Closing Date pursuant to the Price Adjustment Escrow Agreement, in accordance with Section 2.07(b);

(c)        the amount of the Asserted Cure Costs shall be deposited with the Escrow Agent on the Closing Date pursuant to the Asserted Cure Costs Escrow Agreement, in accordance with Section 2.09(a);

(d)        the amount of the Purchaser's Deposit plus all accrued interest thereon shall be deemed to be paid by the Purchaser by the release of such amount on the Closing Date to or for the account of the Sellers by the Escrow Agent, pursuant to the Deposit Escrow Agreement and in accordance with Section 2.14; and

(e)        the Purchase Price shall be adjusted after the Closing to reflect any difference between the Interim Price Adjustment and the Actual Price Adjustment, as provided in Section 2.08(d).

SECTION 2.05        Allocation of the Purchase Price. The Purchase Price shall be allocated among the Purchased Assets as of the Closing Date in accordance with a schedule to be agreed upon by Sellers and Purchaser prior to the Closing Date (the "Allocation"). If the Sellers and the Purchaser are unable to agree upon the Allocation by the Closing Date, then they will each be at liberty to allocate the Purchase Price among the Purchased Assets, in their reasonable discretion; provided however that the Allocation shall in any event include an allocation to the Raw Materials, Finished Goods and Residuals Inventories in an amount equal to the value for the same as of the Effective Time, as determined for purposes of calculating the Actual Price Adjustment. Any subsequent adjustments to the Purchase Price shall be reflected in the Allocation in a manner consistent with Section 1060 of the Tax Code and the Regulations thereunder. Subject to the foregoing provisions of this Section 2.05, for all Tax purposes, the Purchaser and the Sellers agree that the Transactions shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that neither of them will take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise. The Sellers and the Purchaser agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.

SECTION 2.06    <u>Purchaser's Deposit.</u> (a) Within two (2) Business Days of execution of this Agreement, the Purchaser shall pay to the Sellers a good faith deposit in the amount of $8.8 million (the "<u>Purchaser's Deposit</u>") by wire transfer of immediately available good funds. The Purchaser's Deposit shall be held in escrow by the Escrow Agent in accordance with the terms of the Deposit Escrow Agreement.

(b)    Without limiting the rights of the parties hereunder, and subject to terms of the Deposit Escrow Agreement: (i) if this Agreement is terminated by the Sellers or the Purchaser for any of the reasons set forth in Section 8.01(a), (b), (d) or (e) hereof, then the Purchaser's Deposit, plus any accrued interest thereon, shall be returned to the Purchaser; (ii) if this Agreement is terminated by the Sellers for the reason set forth in Section 8.01(c), then the Sellers shall be entitled to retain the Purchaser's Deposit, plus any accrued interest thereon; and (iii) at the Closing, the Purchaser shall cause the Escrow Agent to transfer to the Purchase Price Bank Account the Purchaser's Deposit, plus any accrued interest thereon.

SECTION 2.07    <u>Interim Price Adjustment.</u>  (a) Not less than five (5) nor more than ten (10) Business Days prior to the Closing Date, the Sellers shall deliver a calculation of the Interim Price Adjustment to the Purchaser. The Interim Price Adjustment shall be based upon the Mills segment balance sheet components of Seller's trial balance, adjusted as provided in Exhibit 1.01(f), as at the last day of the month immediately preceding the Closing Date unless the Closing Date occurs within the first fifteen (15) days of a month, in which case the trial balance for the previous month shall be used.

(b)    On the Closing Date, the Purchaser shall deliver to and deposit in trust with the Escrow Agent, pursuant to the terms of a Price Adjustment Escrow Agreement entered into among Sellers, the Purchaser, and the Escrow Agent, in substantially the form attached as Exhibit 2.07(b) (the "<u>Price Adjustment Escrow Agreement</u>"), an amount equal to the Price Adjustment Deposit. Interest earned on the Price Adjustment Deposit shall be deemed a part of the Price Adjustment Deposit for all purposes of this Agreement. The Price Adjustment Deposit shall be released in accordance with Section 2.08. The Sellers and the Purchaser shall each pay, and shall each be liable only for, one-half of the Escrow Agent's escrow fees and charges in connection with the Price Adjustment Deposit escrow account.

SECTION 2.08    <u>Actual Price Adjustment.</u>  (a) Promptly following the Closing, Representatives of Sellers and the Purchaser shall jointly conduct a physical count of the Raw Materials, Finished Goods and Residuals Inventories as of the Effective Time.

(b)    Within twenty (20) Business Days after the Closing Date, the Purchaser shall deliver a written calculation of the Actual Price Adjustment to the Sellers to obtain agreement with respect to the amount thereof. If the Sellers and the Purchaser agree in writing on the amount of the Actual Price Adjustment, then such amount shall be as they have agreed.

(c)    If the Sellers and the Purchaser are unable to agree upon any item(s) of the Actual Price Adjustment within twenty (20) Business Days after delivery by the Purchaser of the written calculation pursuant to Section 2.08(b), then the item(s) in dispute shall be referred by the parties to, and shall be determined by, the Independent Accounting Firm. In such event: (i) each party shall be entitled, but not obligated, to: (A) furnish to the Independent Accounting

Firm such working papers and other documents and information relating to the disputed item(s) as are in the possession or control of such party; (B) present to the Independent Accounting Firm the basis for its view with respect to the disputed item(s); and (C) discuss the determination of the disputed item(s) with the Independent Accounting Firm; (ii) the determination by the Independent Accounting Firm shall be final and binding on the parties; and (iii) the fees and disbursements of the Independent Accounting Firm shall be allocated between the Sellers and the Purchaser in the same proportion that the aggregate amount of such remaining disputed items so referred to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed items so submitted. The Sellers and the Purchaser shall direct the Independent Accounting Firm to use all reasonable efforts to issue to the parties its determination of the disputed items within thirty (30) day after such disputed items are referred to the Independent Accounting Firm.

(d)    On the third Business Day following agreement of the parties with respect to the Actual Price Adjustment, as provided in Section 2.08(b), or if the parties are unable to reach agreement, the resolution of any disputed item(s) by the Independent Accounting Firm pursuant to Section 2.08(c), the appropriate adjusting payment shall be made in accordance with this Section 2.08(d) as follows:

(i)    if the Actual Price Adjustment, as determined in accordance with this Section 2.08, is equal to or greater than the Interim Price Adjustment, then: (A) the Price Adjustment Deposit shall be released to Sellers by the Escrow Agent; and (B) the Purchaser shall pay to the Sellers an amount equal to the difference, if any, between the Actual Price Adjustment and Interim Price Adjustment (the "Price Adjustment Delta") by wire transfer of immediately available, good funds;

(ii)    if the Actual Price Adjustment, as determined in accordance with this Section 2.08, is less than the Interim Price Adjustment and the Price Adjustment Delta is less than the Price Adjustment Deposit, then: (A) an amount equal to the Price Adjustment Delta shall be released to the Purchaser from the Price Adjustment Deposit by the Escrow Agent; and (B) the balance of the Price Adjustment Deposit shall be released to the Sellers by the Escrow Agent; and

(iii)    if the Actual Price Adjustment, as determined in accordance with this Section 2.08, is less than the Interim Price Adjustment and the Price Adjustment Delta is greater than the Price Adjustment Deposit, then: (A) the Price Adjustment Deposit shall be released to the Purchaser by the Escrow Agent; and (B) the Sellers shall pay to the Purchaser by wire transfer of immediately available, good funds an amount equal to the excess of the Price Adjustment Delta over the Price Adjustment Deposit.

SECTION 2.09    Cure Costs. (a) The Purchaser agrees to satisfy as and when due, all Cure Costs. On the Closing Date, the Purchaser shall deliver to and deposit in trust with the Escrow Agent, pursuant to the terms of a Cure Costs Escrow Agreement to be entered into among Sellers, the Purchaser and the Escrow Agent, in substantially the form attached as Exhibit 2.09(a) (the "Asserted Cure Costs Escrow Agreement"), an amount equal to the Asserted Cure Costs (the "Asserted Cure Costs Deposit"). Interest on the Asserted Cure Costs Deposit

shall be deemed a part of the Asserted Cure Costs Deposit for all purposes of this Agreement. The Asserted Cure Costs Deposit shall only be released in accordance with Section 2.09(b). The Sellers and the Purchaser shall each pay, and shall each be liable for, one-half of the Escrow Agent's escrow fees and charges in connection with the Asserted Cure Costs Deposit escrow account.

(b)     As and when any Asserted Cure Costs become Determined Cure Costs, (i) the amount of such Determined Cure Costs shall be released from the Asserted Cure Costs Deposit to the Purchaser by the Escrow Agent, and (ii) if any such Asserted Cure Costs are <u>greater than</u> the corresponding Determined Cure Costs, then the amount equal to the difference between such Asserted Cure Costs and the corresponding Determined Cure Costs shall be released from the Asserted Cure Costs Deposit to the Sellers by the Escrow Agent, in each case in accordance with the terms of the Asserted Cure Costs Escrow Agreement. After all Asserted Cure Costs have become Determined Cure Costs, the balance of the Asserted Cure Costs Deposit shall be released to the Sellers in accordance with the terms of the Asserted Cure Costs Escrow Agreement.

SECTION 2.10     <u>Forestry Services Payments.</u> (a) Not less than five (5) nor more than ten (10) Business Days prior to the anticipated Closing Date, the Sellers shall deliver to the Purchaser a detailed written calculation (the "<u>Forestry Services Statement</u>") of the amount (the "<u>Forestry Services Amount</u>") of the Forestry Services as at such anticipated Closing Date to obtain agreement with respect to the amount thereof. The Forestry Services Statement shall include such supporting data as may reasonably be required in order to confirm the Forestry Services Amount. If the Sellers and the Purchaser agree in writing on the Forestry Services Amount, then such amount shall be as they have agreed.

(b)     At the Closing, the Purchaser shall assume and agree to perform all of the Forestry Services (notwithstanding the amount paid to the Purchaser by the Sellers for the assumption and agreement to perform the Forestry Services by the Purchaser), and the Sellers shall pay to the Purchaser the amount of the Forestry Services Amount as indicated in the Forestry Services Statement (the "<u>Interim Forestry Services Payment</u>") by completed wire transfer of immediately available, good funds on the Closing Date.

(c)     If the Sellers and the Purchaser are unable to agree upon the Forestry Services Amount within sixty (60) Business Days after the Closing Date, then the item(s) in dispute shall be referred by the parties to, and shall be determined by, the Silviculture Expert. In such event: (i) each party shall be entitled, but not obligated, to: (A) furnish to the Silviculture Expert such working papers and other documents and information relating to the disputed item(s) as are in the possession or control of such party; (B) present to the Silviculture Expert the basis for its view with respect to the disputed item(s); and (C) discuss the determination of the disputed item(s) with the Silviculture Expert; (ii) the determination by the Silviculture Expert shall be final and binding on the parties; and (iii) the fees and disbursements of the Silviculture Expert shall be allocated between the Sellers and the Purchaser in the same proportion that the aggregate amount of such remaining disputed items so referred to the Silviculture Expert that is unsuccessfully disputed by each such party (as finally determined by the Silviculture Expert) bears to the total amount of such remaining disputed items so submitted. The Sellers and the Purchaser shall direct the Silviculture Expert to use all reasonable efforts to issue to the parties

its determination of the disputed items within thirty (30) days after such disputed items are referred to the Silviculture Expert.

(d)     On the third Business Day following the agreement of the parties with respect to the Forestry Services Amount, as provided in Section 2.10(a), or, if the parties are unable to reach agreement, the determination of any disputed item(s) by the Silviculture Expert pursuant to Section 2.10(c), then:

(i)     if the Forestry Services Amount, as agreed upon or determined in accordance with Section 2.10(a) or Section 2.10(c), as may be applicable, is less than the Interim Forestry Services Payment, then the Purchaser shall forthwith pay the amount of such difference to the Sellers by wire transfer of immediately available, good funds to the Purchase Price Bank Account; or

(ii)     if the Forestry Services Amount, as agreed upon or determined in accordance with Section 2.10(a) or Section 2.10(c), as may be applicable, is greater than the Interim Forestry Services Payment, then the Sellers shall pay the amount of such difference to the Purchaser by wire transfer of immediately available, good funds to such account as the Purchaser may designate for such purposes.

SECTION 2.11      Closing.  Subject to the terms and conditions of this Agreement, the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities and the Forestry Services contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York at 10:00 A.M. New York time on the third Business Day following the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Section 7.01 and Section 7.02, or at such other place or at such other time or on such other date as the Sellers and the Purchaser may mutually agree upon in writing (the "Closing Date"); provided however that if all of the Surplus TFL Lands have not been removed from TFL 23 by such date in accordance with the *Forest Act* (British Columbia), then the Sellers may by notice in writing to the Purchaser extend the Closing Date to a date no later than April 23, 2008.

SECTION 2.12      Closing Deliveries by the Sellers.  At the Closing, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)     a true copy of each of the Transaction Approval Orders, as entered by the Bankruptcy Court and the Canadian Court, respectively;

(b)     the Bill of Sale, copies of the Deeds for the Owned Real Property located in the United States of America to be recorded with copies of all required Conveyance Tax stamps affixed, the Omnibus Assignment of Lease, the Assignment of Transferred Intellectual Property and such other instruments, in form and substance reasonably satisfactory to the Purchaser, as may be reasonably requested by the Purchaser to effect the transfer of the Purchased Assets to the Purchaser, or to register or evidence such transfer on the public records, in each case duly executed by the applicable Seller;

(c)     executed counterparts of the Price Adjustment Escrow Agreement and the Asserted Cure Costs Escrow Agreement;

Execution Copy

(d)    executed counterparts of each Ancillary Agreement to which any of the Sellers is a party other than the Ancillary Agreements delivered pursuant to Section 2.12(b) and (c);

(e)    a receipt for the amount contemplated by Section 2.04(a);

(f)    the Interim Forestry Services Payment, as contemplated by Section 2.10(b), by wire transfer in immediately available funds to a bank account designated by the Purchaser;

(g)    a certificate of non-foreign status pursuant to section 1.1445-2(b)(2) of the Regulations for each Seller that is selling a United States real property interest within the meaning of section 897(c) of the Tax Code;

(h)    a certificate of residency for the purposes of the Tax Act for each of the Sellers;

(i)    executed counterparts of the GST election referred to in Section 5.16(c); and

(j)    a certificate of a duly authorized officer of each of the Sellers certifying as to the matters set forth in Section 7.02(a).

SECTION 2.13        Closing Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver, or cause to be delivered,

(a)    to the Sellers:

(i)    (A) the amount contemplated by Section 2.04(a), by wire transfer in immediately available funds; and (B) the Purchaser's Deposit, plus any accrued interest thereon, in each case, to the Purchase Price Bank Account;

(ii)    executed counterparts of the Bill of Sale, the Price Adjustment Escrow Agreement, the Omnibus Assignment of Lease, the Assignment of Transferred Intellectual Property and such other instruments, in form and substance satisfactory to the Sellers, as may be requested by the Sellers, to effect the assumption by the Purchaser of the Assumed Liabilities and the assumption of and agreement to perform the Forestry Services and to evidence such assumption and agreement to perform on the public records;

(iii)    executed counterparts of each Ancillary Agreement (other than the Ancillary Agreements delivered pursuant to Section 2.13(a)(i)) to which the Purchaser is a party;

(iv)    a receipt for the Interim Forestry Services Payment in accordance with Section 2.10(b);

(v)     a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 7.01(a); and

(vi)    executed counterparts of the GST election referred to in Section 5.16(b); and

(b)     to the Escrow Agent, the Asserted Cure Costs Deposit in accordance with Section 2.09(a) and the Price Adjustment Deposit in accordance with Section 2.07(b).

SECTION 2.14    Registration of Transfers of Real Property. (a) All closing documents shall be executed and placed into escrow at the offices of the Sellers' Solicitors at 12:00 p.m. New York time on the Business Day before the Closing Date, except an original court certified copy of the Transaction Approval Order issued by the Canadian Court (the "Canadian Transaction Approval and Vesting Order"), which will be placed into escrow at the offices of the Sellers' Canadian Solicitors by 12:00 p.m. New York time on the Business Day before the Closing Date, and except a *Land Title Act* (British Columbia) form 17 application, property transfer tax forms and sufficient funds to pay the property transfer tax for the Owned Real Property located in Canada that is to be transferred to the Purchaser by the registration of the Canadian Transaction Approval and Vesting Order in the Land Title Office, which will be executed and placed into escrow at the offices of the Purchaser's Solicitors (with copies of the form 17 and the property transfer tax forms provided to the Sellers' Canadian Solicitors) by 12:00 p.m. New York time on the Business Day before the Closing Date. The Purchaser shall provide the monies referred to in Section 2.04(a), Section 2.04(b) and Section 2.04(c) to the Purchaser's Solicitors in trust by the same deadline. The closing documents and the monies referred to in Section 2.04(a), Section 2.04(b) and Section 2.04(c) shall then be held in escrow until released as provided in this Section 2.14. Upon all closing documents being escrowed and receipt by the Sellers' Solicitors and the Sellers' Canadian Solicitors of written confirmation from the Purchaser's Solicitors that they hold the monies referred to in Section 2.04(a), Section 2.04(b) and Section 2.04(c) in trust, the Canadian Transaction Approval and Vesting Order shall be released to the Purchaser's Solicitors on trust conditions and undertakings of the Purchaser's Solicitors approved by the Sellers' Canadian Solicitors and the Purchaser's Solicitors, both acting reasonably, and failing such agreement as arbitrated by an independent real estate solicitor qualified and actively practicing real estate law in Vancouver, British Columbia agreed to by the Sellers' Canadian Solicitors and the Purchaser's Solicitors or, failing such agreement, appointed by the Canadian Court upon application of either the Purchaser or the Sellers. Forthwith upon receipt by the Purchaser's Solicitors of the Canadian Transaction Approval and Vesting Order, and provided at that time none of the conditions to Closing contained in Article VII that have not been waived remain unfulfilled, the Purchaser shall cause the Purchaser's Solicitors to submit the Canadian Transaction Approval and Vesting Order with the form 17, the property transfer tax forms and payment of the property transfer tax for registration in the Land Title Office on the Closing Date. The undertakings of the Purchaser's Solicitors shall include an undertaking from the Purchaser's Solicitors to the Sellers and the Sellers' Canadian Solicitors that if the monies referred to in Section 2.04(a) are not paid to the Sellers on the Closing Date and the monies referred to in Section 2.04(b) and Section 2.04(c) are not paid to the Escrow Agent pursuant to the Price Adjustment Escrow Agreement and the Asserted Cure Costs Escrow Agreement, respectively, on the Closing Date, the Purchaser's Solicitors will, upon the written request of the Sellers or the Sellers' Canadian Solicitors, forthwith request that the registration of the Canadian

Transaction Approval and Vesting Order be withdrawn and cancelled. Forthwith upon submitting the Canadian Transaction Approval and Vesting Order for registration in the Land Title Office on the Closing Date the Purchaser will instruct the Purchaser's Solicitors to conduct post-filing land title searches of the Owned Real Property for which the Canadian Transaction Approval and Vesting Order has been deposited for registration and if the post-filing land title searches of such Owned Real Property show pending numbers assigned to the Canadian Transaction Approval and Vesting Order, the Purchaser shall instruct the Purchaser's Solicitors to provide written notification of same to the Sellers' Solicitors and the Sellers' Canadian Solicitors and provided at that time none of the conditions to Closing contained in Article VII that have not been waived remain unfulfilled the Purchaser shall cause the Purchaser's Solicitors to deliver to the Sellers at the Closing the monies referred to in Section 2.04(a) and to the Escrow Agent the monies referred to in Section 2.04(b) and Section 2.04(c), the Sellers shall cause the Sellers' Solicitors to deliver to the Purchaser the monies referenced in Section 2.10(b), and the closing documents held in escrow pursuant to this Section 2.14 shall be delivered at the Closing to the appropriate party.  If such post-filing land title searches are not received by the Closing Date or if such post-filing land title searches do not show pending numbers assigned to the Canadian Transaction Approval and Vesting Order, or if at that time any of the conditions to Closing contained in Article VII that have not been waived are unfulfilled, then the Purchaser shall, upon the written request of the Sellers' Solicitors or the Sellers' Canadian Solicitors, forthwith cause the Purchaser's Solicitors to apply to the Land Title Office for withdrawal of the Canadian Transaction Approval and Vesting Order and execute and deliver to the Seller all instruments required to reconvey the Owned Real Property for which the Canadian Transaction Approval and Vesting Order was deposited for registration to the Sellers, all without prejudice to any rights or remedies of the parties under this Agreement, and upon receipt by the Purchaser's Solicitors of the withdrawn Canadian Transaction Approval and Vesting Order and delivery of the Canadian Transaction Approval and Vesting Order to the Sellers, the Purchaser's Solicitors shall be entitled to release the monies referred to in Section 2.04(a), Section 2.04(b) and Section 2.04(c) to the Purchaser, together with any and all interest earned thereon, the Sellers' Solicitors shall be entitled to release the monies referred to in Section 2.10(b) to the Seller, together with any and all interest earned thereon and the remaining documents held by the solicitors shall be redelivered to the relevant maker or makers thereof for cancellation, without in any way impairing the rights and obligations of the parties to one another under this Agreement.

      (b)    Notwithstanding anything in this Section 2.14 to the contrary, all deeds and associated transfer documents (including transfer tax forms) for the Owned Real Property located in the United States (the "US Owned Real Property Transfer Documents") shall be executed and placed into escrow with the title insurance company (the "Title Company") for recordation with the applicable county clerks or county recorder's office, as the case may be in each county where the Owned Real Property will be transferred pursuant to this Agreement.  The Title Company shall hold in escrow all U.S. Owned Real Property Transfer Documents for recordation until instructed to release and record such documents pursuant to written notice from both Sellers' Solicitors and Purchaser's Solicitors on the Closing Date.  Upon such notice, the Title Company shall record all applicable documents and return copies of the recorded documents to Purchaser's Solicitors.

      SECTION 2.15    Post-Closing Notification.  Upon completion of the Closing, the Purchaser and Sellers will confirm the completion in writing to the Minister of

Forests of British Columbia within seven (7) days after the completion as required by section 54.2 of the *Forest Act* (British Columbia).

SECTION 2.16      Landfill Price Adjustment.As an inducement for the Purchaser to include the Castlegar Landfill Site as a Purchased Asset and an allowance for the potential environmental remediation and landfill closure costs that are anticipated in connection with the Castlegar Landfill Site, the Purchase Price shall be reduced by $4 million (the "Landfill Price Adjustment").

SECTION 2.17      Wind-Up Deficiency.  (a) Prior to the Closing Date, the Sellers shall cause Mercer (Canada) Limited to prepare, and provide to the Purchaser, a letter showing the estimated actuarial valuation for funding purposes of the PTL Retirement Plan for Employees represented by the Canadian Merchant Service Guild, as amended (the "CMSG Plan"), as at December 31, 2007, which letter shall be addressed to the Purchaser.  Any estimated deficiency in the Wind-up Financial Position of such plan as shown in such letter, and after giving effect to any additional contributions required to be made by Sellers from January 1, 2008 to the Closing Date as reflected in such letter, is the "Wind-up Deficiency."

(b)      Within twenty (20) Business Days after the Closing Date, Sellers shall cause Mercer (Canada) Limited to prepare a report showing the actual actuarial valuation for funding purposes of the CMSG Plan as at the Closing Date (the "Closing Date Mercer Report") and provide a copy of such Closing Date Mercer Report to the Purchaser under a transmittal letter from Mercer (Canada) Limited addressed to the Purchaser.  Any difference between the Wind-Up Deficiency and the deficiency, if any, in the Wind-Up Financial Position as shown in the Closing Date Mercer Report (after giving effect to any additional contributions required to be made by Sellers from January 1, 2008 to the Closing Date as reflected therein or in the transmittal letter) (the "Closing Date Wind-Up Deficiency"), shall be paid as follows:

(i)      if the Closing Date Wind-Up Deficiency is less than the Wind-Up Deficiency, then the Purchaser shall forthwith pay the amount of such difference to the Sellers by wire transfer of immediately available, good funds to the Purchase Price Bank Account; and

(ii)      if the Closing Date Wind-Up Deficiency is greater than the Wind-Up Deficiency, then the Sellers shall forthwith pay the amount of such difference to the Purchaser by wire transfer of immediately available, good funds to such account as the Purchaser may designate for such purposes.

(c)      Any letters or reports prepared pursuant to this Section 2.17 shall be prepared in accordance with accepted actuarial practice and the Wind-up Deficiency and Closing Date Wind-up Deficiency shall be determined in accordance with the standards set by the *Pension Benefits Standards Act* (British Columbia).

ARTICLE III

REPRESENTATIONS AND WARRANTIES
OF THE SELLERS

Except as set forth in the SEC Reports, the Sellers hereby represent and warrant to the Purchaser, as of the date hereof or, if a representation or warranty is made as of a specified date, as of such date, as follows:

SECTION 3.01      Organization, Authority and Qualification of the Sellers. Except as a result of the commencement of the Chapter 11 Cases and the Canadian Proceedings, each of the Sellers is a corporation or partnership, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, and, subject to obtaining the approval of the Bankruptcy Court and Canadian Court, has all necessary power and authority to enter into this Agreement and the Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the Transactions. Each of the Sellers is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its respective business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing: (a) has resulted from the commencement or continuance of the Chapter 11 Cases or the Canadian Proceedings; or (b) would not:  (i) adversely affect the ability of such Seller to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (ii) otherwise have a Material Adverse Effect.  Subject to obtaining the Approval Orders from the Bankruptcy Court and Canadian Court, the execution and delivery of this Agreement and the Ancillary Agreements by each Seller, the performance by each Seller of its obligations hereunder and thereunder, and the consummation by each Seller of the Transactions have been duly authorized by all requisite action on the part of such Seller and its stockholders or partners, as the case may be.  This Agreement has been, and upon their execution, the Ancillary Agreements shall have been, duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by the Purchaser), subject to the approval of the Bankruptcy Court and Canadian Court, this Agreement constitutes, and, upon their execution, the Ancillary Agreements shall, constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

SECTION 3.02      No Conflict.  Subject to the approval of the Bankruptcy Court and the Canadian Court, and assuming that all consents, approvals, authorizations and other actions described in Section 3.03 have been obtained, all filings and notifications listed in Section 3.03 of the Disclosure Schedule have been made, and any applicable waiting period has expired or been terminated, and except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Sellers do not and will not, except as set forth in Section 3.02 of the Disclosure Schedule:  (a) violate, conflict with or result in the breach of the certificate of incorporation, articles or bylaws (or similar organizational documents) of any of the Sellers; (b) conflict with or violate any Law or Governmental Order applicable to any of the Sellers; or

(c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which any of the Sellers is a party, except to the extent that any such rights of termination, acceleration or cancellation are not enforceable due to operation of the Bankruptcy Code or CCAA, and except, in the case of clauses (b) and (c), as would not: (i) materially and adversely affect the ability of any of the Sellers to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (ii) otherwise have a Material Adverse Effect.

SECTION 3.03    Governmental Consents and Approvals.    The execution, delivery and performance of this Agreement and each Ancillary Agreement by the Sellers do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except: (a) the approval of the Bankruptcy Court and the Canadian Court; (b) as described in Section 3.03 of the Disclosure Schedule, (c) compliance with and filing under the pre-merger notification and waiting period requirements of the HSR Act, and the Competition Act, and any compliance with, filings under or approval required under, the antitrust laws of any other relevant jurisdiction; (d) any applicable requirements under the ICA; (e) any notices to proceed and other consents required under the *Forest Act* (British Columbia), including the notice to proceed under section 54.1 of the *Forest Act* (British Columbia); (f) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by the Sellers of the Transactions, and would not have a Material Adverse Effect; or (g) as may be necessary as a result of any facts or circumstances relating solely to the Purchaser or any of its Affiliates.

SECTION 3.04    SEC Filings; Financial Statements; Undisclosed Liabilities.    (a) PTI has filed all forms, reports, statements, schedules and other documents required to be filed by it with the SEC since January 1, 2005 (collectively, the "SEC Reports"). The SEC Reports (i) were prepared in accordance with the applicable requirements of the Securities Act of 1933, as amended (the "Securities Act"), the Exchange Act, and, in each case, the rules and regulations promulgated thereunder, and (ii) did not, at the time they were filed, or, if amended, as of the date of such amendment, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. None of the Sellers, other than PTI, is required to file any form, report or other document with the SEC.

(b)    Each of the consolidated financial statements (including, in each case, any notes thereto) contained in the SEC Reports was prepared in accordance with US GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) and each fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of PTI and its consolidated subsidiaries, as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements, to normal and recurring year-end adjustments).

SECTION 3.05    Litigation. Except for the Chapter 11 Cases and Canadian Proceedings, and any and all Actions arising therefrom or related thereto, and as set forth in Section 3.05 of the Disclosure Schedule, as of the date hereof there is no Action by or against any of the Sellers and relating to the Business, pending before any Governmental Authority, that would: (a) adversely affect the ability of any of the Sellers to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; (b) reasonably be expected to have the effect of preventing, making illegal or otherwise materially interfering with the Transactions; or (c) otherwise have a Material Adverse Effect.

SECTION 3.06    Compliance with Laws. Except as set forth in Section 3.06 of the Disclosure Schedule and as would not: (a) adversely affect the ability of any the Sellers to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (b) otherwise have a Material Adverse Effect, the Sellers have conducted and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to the Business, and the Sellers are not in violation of any such Law or Governmental Order.

SECTION 3.07    Sufficiency of Purchased Assets. The Purchased Assets, together with the Excluded Assets, constitute all of the assets material to the Sellers' conduct of the Business prior to the date of this Agreement.

SECTION 3.08    Real Property Interests. (a) Section 2.01(a)(i)(A) of the Disclosure Schedule lists the street address, and the current owner, of each parcel of real property in which PTL or PTSLP have fee title (or equivalent) interest, to the extent used in the conduct of the Business, other than any real property set forth in Section 2.01(a)(x) or Section 2.01(b)(ix) of the Disclosure Schedule. Except as would not have a Material Adverse Effect or except as described in Section 3.08(a) of the Disclosure Schedule: (i) to the Sellers' Knowledge, each Seller listed on Section 2.01(a)(i)(A) of the Disclosure Schedule as owner of a parcel of Owned Real Property has title in fee simple to such parcel free and clear of all Liens, except Permitted Encumbrances; (ii) to the extent as are in the Sellers' possession, the Sellers have made available to the Purchaser copies of each deed for each parcel of Owned Real Property.

(b)    Section 2.01(a)(i)(B) of the Disclosure Schedule lists the street address of each parcel of real property leased or subleased by any Seller as tenant or subtenant, as the case may be, to the extent used in the conduct of the Business, and the identity of the lessee of each such parcel of Leased Real Property, other than any real property set forth in Section 2.01(a)(x) of the Disclosure Schedule or any real property leased or subleased pursuant to a lease set forth in Section 2.01(b)(ix) of the Disclosure Schedule. The Sellers have delivered to the Purchaser, copies of the leases in effect at the date hereof relating to the Leased Real Property, other than as would not have a Material Adverse Effect, and, except as set forth on Section 2.01(a)(i)(B) of the Disclosure Schedule, there has not been any sublease or assignment entered into by any of the Sellers in respect of the leases relating to the Leased Real Property.

SECTION 3.09    Tangible Personal Property. All material tangible personal property owned by the Sellers that is used in the Business is located at the Mills, Reload Facilities, Permitted and Licensed Crown Lands, at the Portland Premises or at the land listed in Section 2.01(a)(x) of the Disclosure Schedule. Section 3.09 of the Disclosure Schedule contains

a true and complete list of all machinery, equipment, motor vehicles, furnishings, trade fixtures, chattels, and other tangible personal property owned by Sellers and used principally in connection with the Business as of the date of this Agreement (other than items (a) of tangible personal property the cost of which to Sellers was less than $20,000; (b) that are Excluded Assets or GRFC Assets).

SECTION 3.10    Intellectual Property. Section 3.10 of the Disclosure Schedule sets forth a true and complete list of all Registered Transferred Intellectual Property. Except as set forth in Section 3.10 of the Disclosure Schedule or as would not have a Material Adverse Effect:  (a) a Seller is the owner of the entire right, title and interest in and to each item of Registered Transferred Intellectual Property; (b) to the Knowledge of the Sellers, no Person is engaging in any activity that infringes, misappropriates or otherwise violates any Registered Transferred Intellectual Property; and (c) there is no Action pending or, to the Knowledge of the Sellers, threatened in writing, against any Seller alleging that the use of any Transferred Intellectual Property infringes, misappropriates or otherwise violates the Intellectual Property rights of any third party.  The Purchaser acknowledges that the representations and warranties contained in Section 3.10(b) and Section 3.10(c) are the only representations and warranties being made in this Agreement with respect to infringement, misappropriation or other violation of Intellectual Property.

SECTION 3.11    Permits and Licenses. Section 3.11 of the Disclosure Schedule contains a complete and accurate list of all material licenses, permits, approvals, consents, certificates, registrations, and authorizations (governmental, regulatory, or otherwise) held by or issued to Sellers in respect of the Business other than the GFRC Assets.

SECTION 3.12    Timber Tenures. Except as disclosed in Section 3.12 of the Disclosure Schedule:

(a)    to the Sellers' Knowledge, each Timber Tenure is validly subsisting and all levies, fees, rentals, charges, dues, stumpage and other costs payable up to Closing under each Timber Tenure have been or will be paid by the Sellers, except for current levies, fees, charges, dues, rentals, stumpage and other costs that shall be paid by Sellers following the Closing Date;

(b)    to the Sellers' Knowledge, the Sellers have observed and performed in all material respects all covenants, agreements and obligations on its part to be observed or performed under the provisions of the Timber Tenures and all applicable Laws;

(c)    the Sellers has not received any written notice of breach by the Sellers of any Timber Tenure or applicable Law that has not been remedied by Sellers or abandoned by the Person alleging such breach; and

(d)    other than as contemplated by the *Forestry Revitalization Act* (British Columbia), no Governmental Authority has given any written notice to the Sellers since January 1, 2003 with respect to one or more of the Timber Tenures which would have the effect of reducing, impairing, suspending or terminating in a material manner such Timber Tenure or any rights or privileges attached thereto.